JOSEPH E. CORRIGAN, Respondent, v, THE BOBBS-MERRILL COMPANY, Appellant, Impleaded with Another.

Libel — evidence — damages — actual damages may be recovered against corporation as publisher of book containing libelous matter, irrespective of ill will or intent to injure — punitive damages defined — when properly allowed — what evidence of knowledge that matter offered for publication was a malicious libel is required to charge officers of corporation therewith and make corporation liable therefor — agency — knowledge of agent when attributable to principal.

1. The fact that the publisher had no actual intention to defame a particular man or indeed to injure any one, does not prevent recovery of compensatory damages by one who connects himself with the publi-

cation of a libel, at least in the absence of some special reason for a positive belief that no one existed to whom the description answered. He cannot show that a libel was not of and concerning the plaintiff by proving that he never heard of the plaintiff. Reputations may not be traduced with impunity, whether under literary forms of a work of fiction, or in jest, or by inadvertence, or by the use of words with a double meaning.

2. Unless the judge rules that the occasion is privileged, the question of malice is never for the jury when compensatory damages alone are sought; the plaintiff recovers damages if he proves that the words apply to him and that his reputation has been injured, whether such injury is the result of defendant's evil disposition towards him or a mere concatenation of adventitious circumstances.

3. Malice has two distinct meanings in the law of libel from which two distinct burdens are imposed on plaintiff. It may mean " either actual malice or such malice as by legal fiction is presumed for the purpose of reconciling certain other rules in the law of libel." In order to recover punitive damages against a publisher of a work of fiction containing libelous matter plaintiff is bound to satisfy a jury by a fair preponderance of evidence that defendant (1) was animated, in a publication, by conscious ill will toward him, or (2) did not publish the alleged libel in good faith and in the honest belief that it was fiction, but was indifferent as to whether it would injure some real party actually referred to.

4. Actual malice, as a basis for punitive damages, might be inferred as against its author from the falsity of a publication, where conscious ill will appears therefrom, but not as against the mere publisher of a libel in a novel which on its face does not purport to be serious or bear the evidence of malice against an actual individual or against any one. The publisher in such a case is not liable to exemplary damages for the acts of the author upon mere proof of publication.

5. While a corporation knows a fact only as its officers and agents know it, it does not know all that its agents know, but only what comes to them while acting for the corporation within the scope of the agency, when it is their duty to report their knowledge to the general officers or agents of the company. It may then be presumed that they have told the principal what they know.

6. On examination of the evidence in an action brought against the publisher of a book containing libelous matter, *held, first,* that the proof of actual knowledge of the defendant's vice-president of a purpose to libel plaintiff is unsatisfactory; *second,* that the knowledge of the manager of another department of defendant's business which was not received while he was acting as defendant's agent was not the knowledge of defendant and should not have been sub-

mitted to the jury; *third,* ·that the knowledge or indifference, if either appeared, of defendant's literary editor and chief manuscript reader was chargeable to defendant. Although he was not authorized to accept a malicious libel for publication, if he did so in the course of his employment intentionally or without proper inquiry, defendant is liable for the act.

*Corrigan* v. *Bobbs-Merrill Co.,* 182 App. Div. 919, reversed.

(Argued January 12, 1920; decided January 27, 1920.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered March 21, 1918, modifying and affirming as modified a judgment in favor of plaintiff entered upon a verdict.

The nature of the action and the facts, so far as material, are stated in the opinion.

*John L. Lockwood* for appellant. The dismissal of defendant's first separate defense was error. (*White* v. *Nichols,* 44 U. S. 266; *Morey* v. *Morning Journal,* 123 N. Y. 207; *Cooper* v. *Greeley,* 1 Den. 247; *Coxhead* v. *Richards,* 2 Man., G. & S. 569; Code Civ. Pro. § 535; *Corr* v. *Sun P. & P. Co.,* 177 N. Y. 131; *Stokes* v. *Morning Journal,* 66 App. Div. 569; *People* v. *Parr,* 42 Hun, 313; *Morrison* v. *Smith,* 177 N. Y. 366; *Lewis* v. *Chapman,* 16 N. Y. 369; *Samuels* v. *Evening Mail,* 9 Hun, 288; 75 N. Y. 604.) No authority of Bernhardt was shown to act as agent of the Bobbs-Merrill Company so as to make proof of his knowledge or declarations admissible or binding upon the defendant, and the jury's finding that such authority existed is not merely contrary to the evidence, but without evidence to support it. (*Taylor* v. *Comcl. Bank,* 174 N. Y. 187; *Foster* v. *Bookwalter,* 152 N. Y. 166; *Peoples Bank* v. *St. Anthony's R. C. Church,* 109 N. Y. 512; *Norton* v. *Duke,* 120 App. Div. 1; *Nixon* v. *Palmer,* 8 N. Y. 398; *Adair* v. *Brimmer,* 74 N. Y. 539; *Whitney* v. *Martini,* 88 N. Y. 535; *Baldwin* v. *Burrows,* 47 N. Y. 199; *King* v. *Mackellar,* 109 N. Y. 215; *Seymour* v. *Wyckoff,*

10 N. Y. 213; *Trustees* v. *Bowman*, 136 N. Y. 521, 526; *Prichard* v. *Sigafus*, 103 App. Div. 535, 539; *Hogue* v. *Simonson*, 94 App. Div. 139, 141.) The court erred in admitting testimony by the witnesses Johnson, Francis and Kingsley as to the knowledge and declarations of Carl Bernhardt concerning the libelous character of the book and Howard's malicious purpose in writing it, and in denying defendant's motions to strike out such testimony. (*Cobb* v. *United Engineering Co.*, 191 N. Y. 475; *State Bank* v. *Brocton F. J. Co.*, 208 N. Y. 492; *Peoples Bank* v. *St. Anthony's R. C. Church*, 109 N. Y. 512; *Corn* v. *Bergman*, 145 App. Div. 218; *Taylor* v. *Comcl. Bank*, 174 N. Y. 181; *Bank of N. Y. N. B. Assn.* v. *Am. D. & T. Co.*, 143 N. Y. 559; *White* v. *Miller*, 71 N. Y. 118; *Goetz* v. *Met. St. Ry. Co.*, 54 App. Div. 365; *Constant* v. *University of Rochester*, 111 N. Y. 604; *Badger* v. *Cook*, 117 App. Div. 328.) The court erred in refusing to charge the jury defendant's requests as to Carl Bernhardt and the evidence of his authority. (*Comey* v. *Harris*, 133 App. Div. 686; *Badger* v. *Cook*, 117 App. Div. 328; *Constant* v. *University of Rochester*, 111 N. Y. 604; *Brigger* v. *Mutual R. F. Life Assn.*, 75 App. Div. 149.)

*Henry N. Arnold* and *Cambridge Livingston* for respondent. The court was right in dismissing the pretended complete defense, denominated " a first separate defense to plaintiff's alleged cause of action." (*Holmes* v. *Jones*, 147 N. Y. 59; *Broughton* v. *McGraw*, 39 Fed. Rep. 672; *Town Topics Pub. Co.* v. *Collier*, 114 App. Div. 191; *Brinkman* v. *Taylor*, 103 Fed. Rep. 773; *Loftus* v. *Bennett*, 68 App. Div. 128; *Kelly* v. *Huffington*, Fed. Cas. No. 7671; *Grossman* v. *Morning Journal*, 197 N. Y. 474; *Tillotson* v. *Cheatham*, 3 Johns. 56; *Bingham* v. *Gaynor*, 135 App. Div. 426; *Palmer* v. *News*, 31 App. Div. 210.) The court having dismissed the pretended complete defense, correctly charged the jury concerning the immateriality of the publisher's actual intent under the general

issue. (*Van Ingen* v. *Mail & Express*, 156 N. Y. 376; *Stokes* v. *Morning Journal*, 66 App. Div. 569.) The court committed no error in charging the jury or in refusing to charge as requested by defendant. (*Cohalan* v. *Press Co.*, 212 N. Y. 344; *Smith* v. *Matthews*, 152 N. Y. 152; *Crane* v. *Bennett*, 177 N. Y. 106; *Brandt* v. *Morning Journal Assn.*, 81 App. Div. 188; 177 N. Y. 544; *Carpenter* v. *Evening Journal*, 111 App. Div. 266; *Palmer* v. *Mahin*, 120 Fed. Rep. 737.)

POUND, J. The plaintiff, Joseph E. Corrigan, has recovered a judgment against appellant for $25,000 damages in an action for libel. He is a city magistrate of the city of New York, of good standing as a man and a judge. Defendant is an Indiana corporation having its place of business and principal office in Indianapolis. It publishes books of fiction and has a New York office. The defendant George Bronson Howard, a writer of stories and plays, who was not served and did not appear in the action, wrote a sensational novel entitled " God's Man," of which appellant published upwards of ten thousand copies in the regular course of its extensive book business. The novel depicts, somewhat realistically, the adventures of one Arnold L'Hommedieu in New York's underworld and elsewhere and contains chapters entitled " Arnold's Adventures in Plunderland," " Sons of Subterranea " and the like. A chapter, which in the table of contents bears the caption " Justice — a la Corigan " but which in the body of the book is headed " Justice — a la Cornigan," brings the hero into Jefferson Market Court in the city of New York, a court in which plaintiff frequently sat as magistrate, and deals with the disposition of cases by the magistrate Cornigan. The inference from the unsavory details as related to the facts is unmistakably that the author Howard intended by this chapter deliberately and with personal malice to vilify plaintiff, under the barely fictitious name of Cornigan, in his

official capacity and to expose him to hatred, contempt, ridicule and obloquy as being ignorant, brutal, hypocritical, corrupt, shunned by his fellows, bestial of countenance, unjust, dominated by political influences in making decisions and grossly unfit for his place. A paragraph in another chapter entitled " The Gay Life," of like import, portrays the man Cornigan even more offensively, as an associate of low and depraved characters. No attempt was made by defendant to establish the truth of these allegations or any of them, and the only question here is whether plaintiff properly proved his case.

Defendant's first separate defense is that it published a supposedly fictitious narrative in good faith; did not know plaintiff and had no intent to injure him. This is not a complete defense. Even the Massachusetts rule as laid down in *Smith* v. *Ashley* (11 Metc. 367) holding the writer alone responsible in such a case, has been discredited by later decisions in that jurisdiction. (*Hanson* v. *Globe Newspaper Co.*, 159 Mass. 293, 295.) The appellant is chargeable with the publication of the libelous matter if it was spoken " of and concerning " him, even though it was unaware of his existence or that it was written " of and concerning " any existing person. Apart from the question of express malice, proof that the chapter actually referred to plaintiff would sustain his cause of action.

" If the publication was libelous, the defendant took the risk. As was said of such matters by Lord MANSFIELD, ' Whatever a man publishes, he publishes at his peril.' " (HOLMES, J., in *Peck* v. *Tribune Co.*, 214 U. S. 185, 189.)

The fact that the publisher has no actual intention to defame a particular man or indeed to injure any one, does not prevent recovery of compensatory damages by one who connects himself with the publication, at least, in the absence of some special reason for a positive belief that no one existed to whom the description answered. The

question is not so much who was aimed at, as who was hit.

" The writing, according to the old form, must be malicious, and it must be of and concerning the plaintiff. Just as the defendant could not excuse himself from malice by proving that he wrote it in the most benevolent spirit, so he cannot shew that the libel was not of and concerning the plaintiff by proving that he never heard of the plaintiff. His intention in both respects equally is inferred from what he did. His remedy is to abstain from defamatory words." (Lord LOREBURN, L. C., in *Hulton* v. *Jones*, 1910, A. C. 20, 24.)

This rule is unqualifiedly applied to publications in the newspaper press, and is no different when applied to those who issue books. Works of fiction not infrequently depict as imaginary, events in courts of justice or elsewhere actually drawn or distorted from real life. Dickens, in " Pickwick Papers " has a well-known court scene of which Mr. Serjeant Ballantine says in his " Experiences " that Mr. Justice Gaselee " has been delivered to posterity as having presided at the famous trial of *Bardell* v. *Pickwick*. I just remember him and he certainly was deaf." Goldwin Smith, the distinguished historian and publicist, said of Disraeli's veiled attack upon him as " The Oxford Professor " in the novel " Lothair," that (Reminiscences, p. 171): " He afterwards pursued me across the Atlantic, and tried to brand me, under a perfectly transparent pseudonym, if ' Oxford Professor ' could be called a pseudonym at all, as a ' social sycophant.' There is surely nothing more dastardly than this mode of stabbing a reputation." The power of Charles Reade's descriptions of prison life in " It's Never Too Late to Mend " and the abuses of private insane asylums in " Hard Cash " is undeniable, although the truth of some of his details was challenged. The novel of purpose, such as " Uncle Tom's Cabin," often deals with incidents and individuals not wholly

imaginary. Reputations may 'not be traduced with impunity, whether under the literary forms of a work of fiction, or in jest (*Griggs* v. *Sun Printing & Pub. Assn.*, 179 N. Y. 144), or by inadvertence (*Moore* v. *Francis*, 121 N. Y. 199, 207), or by the use of words with a double meaning. (*Morrison* v. *Smith*, 177 N. Y. 366; *First Nat. Bank of Waverly* v. *Winters*, 225 N. Y. 47, 50.) Publishers cannot be so guileless as to be ignorant of the trade risk of injuring others by accidental libels.

The conventional way of putting the general rule is " that in a case of libelous publication, the law implies malice and infers some damage." (*Byam* v. *Collins*, 111 N. Y. 143, 150.) Avoiding, for the nonce, the time-honored words " implied malice," which are a stumbling block for many, we may safely say that unless the judge rules that the occasion is privileged, the question of malice is never for the jury when compensatory damages alone are sought; the plaintiff recovers damages if he proves that the words apply to him and that his reputation has been injured, whether such injury is the result of defendant's evil disposition towards him or a mere concatenation of adventitious circumstances.

Plaintiff made out a cause of action for compensatory damages, but he did not rest his case on proof that the publication was " of and concerning " him and libelous. He went further and sought to prove something, not to be presumed as against appellant from the publication itself, that would justify the jury in giving him an additional sum by way of exemplary damages or smart money, based on an inference of actual malice or willingness to injure his reputation on the part of the appellant.

The distinction between the right to compensatory and punitive damages is clear. Actual injury to reputation must be paid for in all events. From an intent to injure, chargeable to defendant, follows the rule that exemplary damages, " a sort of hybrid between a display of ethical

indignation and the imposition of a criminal fine " (*Haines v. Schultz*, 50 N. J. Law, 481), may also be awarded. Malice may, in some cases, be implied from the publication itself, where the natural inference from the libel is that it was aimed directly at reputation, but where that inference does not flow naturally from the facts, adequate evidence of actual malice or its equivalent should be produced if punitive damages are sought.

Actual malice might be inferred as against the author from the falsity of the publication (*Cohalan* v. *New York Press Co.*, 212 N. Y. 344), but not as against the mere publisher of a libel in a novel which on its face does not purport to be serious or bear the evidence of malice against an actual individual or against any one. (*Times Pub. Co.* v. *Carlisle*, 94 Fed. Rep. 762.) The publisher in such a case is not liable to exemplary damages for the acts of the author upon mere proof of publication. If defendant had, in entire good faith, supposed that it was publishing a satire on courts of justice generally, which would hit no judge in particular, and which would be so understood by the readers of the book, and if its belief in that regard was justifiable, the circumstances not calling for some inquiry at the source, it could not be said to be inspired by malice in fact.

Of course, as the trial justice said, " malice is malice," but it, unfortunately, has two distinct meanings in the law of libel from which two distinct burdens are imposed on plaintiff. It may mean " either actual malice or such malice as by legal fiction is presumed for the purpose of reconciling certain other rules in the law of libel." (HISCOCK, Ch. J., in *Norske Ameriekalinje* v. *Sun P. & P. Assn.*, 226 N. Y. 1, 9.) In order to recover punitive damages, plaintiff was bound to satisfy the jury by a fair preponderance of evidence that defendant (1) was animated, in such publication, by conscious ill will toward him, or (2) did not publish the Cornigan chapter of the book in good faith and in the honest belief that it was

fiction, but was indifferent as to whether the violent and indecent abuse heaped upon the supposedly fictitious magistrate would injure some real party actually referred to by the author. Indifference as to the rights of others, such as might be found from the fact of publishing scurrilous comment without reasonable investigation, is the equivalent of the intentional violation of such rights.

Not content with resting his case upon the falsity of the publication and its obvious portrayal, with a venomous pen, of scenes, real or imaginary, before a magistrate in Jefferson Market Court — evidence from which a jury might, under the special circumstances of the case, have inferred indifference as to whether any one was injured or not (*Warner* v. *Press Publishing Co.*, 132 N. Y. 181) — plaintiff sought to establish that officers and agents of defendant corporation, whose knowledge was chargeable to it, knew before publication that the purpose of the publication was to injure plaintiff. It may be remarked, parenthetically, as bearing on the question of damages, that as soon as defendant was informed that plaintiff was identified with the Corigan or Cornigan of the book, it suppressed the edition. It also offered to publish, but did not publish, a retraction and apology. It also alleged in its answer as a partial defense, but made no effort to prove, that plaintiff had secured the republication of the libel in the New York *American* in order to enhance his damages.

Evidence of a woman named Saville tends to connect Mr. Curtis, the defendant's vice-president, from whose New York office the advertising of the book was directed, with actual knowledge of a purpose to libel plaintiff, after he had read the book before publication. This witness recanted, and the best that can be said of her testimony, taken alone, is that it was unsatisfactory proof of knowledge on the part of Curtis of Howard's purpose.

Evidence of several witnesses connects intimately Bernhardt, the manager of defendant's dramatic department,

with Howard and the book. If Bernhardt acquired knowledge as to the nature of the publication while acting within the scope of his authority, on behalf of defendant, for its benefit, the defendant is chargeable with his knowledge, otherwise not. (*Corporation of Glasgow* v. *Lorimer*, 1911, A. C. 209.) Bernhardt had to do with sales and leases and other disposition of dramatic and moving picture rights for defendant based on its publications. His contract called on him to devote his " whole time, effort and attention " to the business of the dramatic department and to engage in no other employment whatever. He had a share in the net profits of his department and a personal interest in having books with dramatic possibilities published by defendant, with a view to their future use in his department, but it is not to be presumed that everything he did for Howard was done for defendant. He was not a manuscript reader for defendant. Others did that work for it. He aided Howard on the manuscript and galley proofs of the book not " during ordinary office hours " but at Howard's home in Port Jefferson on week end visits there. It does not appear that defendant ever intrusted him with that kind of work on its behalf. A jury might well infer that he knew that Howard was full of hate and bitterness toward plaintiff, due to his personal experience before the magistrate as defendant on a criminal charge. On one or more occasions, as witnesses testified, it was brought home to Bernhardt directly that Howard was getting even with plaintiff by means of his book, and that Bernhardt knew it was a serious libel but said that defendant was willing to take a chance for the sake of the publicity that might result. We fail to see how Bernhardt's acts, knowledge or declarations in this connection are chargeable to defendant. Publishing books or accepting or preparing books for publication, was not an incident of the defendant's dramatic department. It does not appear that anything that Bernhardt did or said in connection with the prep-

aration and publication of Howard's book was within the scope of his employment. The relation of the book to dramatic purposes before publication was remote and speculative. His acts and declarations had no connection with any transaction then being conducted by him with authority for his principal. Authority cannot be inferred from what he said and did, from the mere fact that he was in defendant's employ in a different capacity, even if it appeared that defendant's general officers knew that he was helping Howard, unless it could be inferred that it was *as defendant's agent* that he was helping Howard. His knowledge was not acquired in defendant's business and therefore was not the knowledge of defendant. An employee of a publisher, not charged with reading manuscripts, might aid an author to prepare a libel and get it published and boast about his firm's connection with it without creating any reasonable inference that he was acting for his employer in that regard, so long as his knowledge was not communicated to his employer. While a corporation knows a fact only as its officers and agents know it, it does not know all that its agents know, but only what comes to them while acting for the corporation within the scope of their agency, when it is their duty to report their knowledge to the general officers or agents of the company, and it may be presumed that they have told the principal what they know. (*Weisser* v. *Denison*, 10 N. Y. 68, 77; *Welsh* v. *German American Bank*, 73 N. Y. 424; *Cragie* v. *Hadley*, 99 N. Y. 131; *Casco Nat. Bank* v. *Clark*, 139 N. Y. 307, 313, 314; *Taylor* v. *Commercial Bank*, 174 N. Y. 181.) An inference may not be drawn as to the intention of defendant from the state of mind of Bernhardt, who had no part in accepting the novel or deciding on behalf of defendant what it should contain.

" To bring about this result two things must concur, viz., the possession by the agent of pertinent information and his personal participation in respect thereto on behalf

of the corporation." (*Willard* v. *Denise*, 50 N. J. Eq. 482, 484.) Thus, information as to the true state of health and physical condition of an applicant for life insurance, given to a soliciting agent of the company having no authority to effect insurance and issue policies is not the knowledge of the company, because " it is a fundamental principle in the law of agency that for information given an agent to be attributable to his principal the information must be imparted to the agent in the course of his agency." (CULLEN, J., in *Butler* v. *Michigan Mut. Life Ins. Co.,* 184 N. Y. 337, 340.)

Nor can it be said that defendant in any way consciously accepted the result of Bernhardt's assistance to Howard as having achieved anything that it sought to have accomplished, or from which it might have any benefit. What Bernhardt did for Howard was not done for defendant and was not for defendant's profit in any sense and was neither authorized nor ratified by it. There can be no ratification without knowledge or notice of the facts. (*Smith* v. *Kidd*, 68 N. Y. 130, 132). Bernhardt's knowledge was no more chargeable to defendant than would be the knowledge of the printer if Howard had taken him into his confidence.

Respondent urges that it is " past the bounds of belief " that Bernhardt had never reported his knowledge of Howard's purpose to appellant, or that appellant did not know that Bernhardt was working for it on the book. The inference that defendant was chargeable with such information is purely speculative and the jury may not thus bridge the gap between evidence and conjecture. (*Kelly* v. *Nassau El. Ry. Co.*, 227 N. Y. 39.)

The evidence of Bernhardt's knowledge of Howard's purpose to defame plaintiff was properly excepted to and should not have been submitted to the jury. The nature of such evidence was to aggravate damages by bringing Howard's purpose directly home to defendant, thus making it an active and conscious participant in the libel.

Howard was vindictive and if Bernhardt stood in defendant's shoes, defendant was chargeable with inexcusable malice, for it had not even the poor excuse of a personal grudge, and sought only financial gain. This line of evidence was dwelt upon at great length in the judge's charge and is given much importance on the trial and here. The trial justice fairly left the question to the jury to decide whether defendant was responsible for Bernhardt's knowledge, but the evidence was insufficient to present the question. (*Matter of Case*, 214 N. Y. 199, 203, 204.) Its admission cannot be said to be immaterial error. It appears, on the contrary, to be substantial error. It would be essentially unjust to attach such serious consequences to the knowledge of an agent who had no authority to acquire the knowledge for, and was under no duty to communicate it to, his employer. This court may not assume that the effect of the error was counteracted by the fact that the verdict was substantially reduced in the Appellate Division.

Another line of evidence must also be considered. The book is dedicated " to Hewitt Hansom Howland, The Second Father of this Book." The evidence which connects Howard and Howland must be carefully considered, for one may not assume the honor of parentage without some added responsibility for the offspring. Howland was defendant's literary editor and chief manuscript reader at Indianapolis, intimately familiar with the manuscript and in intimate correspondence with the author. What he knew, or should have known, of Howard's purpose was the knowledge of defendant. Although he was not authorized to accept a malicious libel for publication, if he did so in the course of his employment, intentionally or without proper inquiry, defendant is fully liable for his act. (*Citizens Life Ass. Co.* v. *Brown*, 1904, A. C. 423.) He made no investigation or inquiry about the motive of the Corrigan chapter, although he had it in his possession and had been over every page

several times before accepting it for publication. The tone and style of the libel were vituperative in the extreme. It was directed at the administration of criminal justice in a real court, in a manner tending to bring the court into disrepute without the slightest justification or excuse. Howland was indifferent as to that. The jury might be permitted to say that he was negligent and reckless in not a least seeking from Howard some information as to whether the author's diatribes were intended as mere generalizations or as offensive personalities, and, if the latter, whether they were fair criticism or malicious falsehood. (*Crane* v. *Bennett*, 177 N. Y. 106, 114, 115.) That he knew of Howard's ill will toward plaintiff has no substantial foundation in the evidence. Although he knew, as the jury might have found, that Bernhardt was correcting the proof for Howard, Bernhardt's knowledge of Howard's motives was not imputable to him, On the other hand, the varnish of fiction was not so opaque as to conceal from the experienced manuscript reader the possibility that Howard was using bad language and abuse about a magistrate in Jefferson Market Court with more feeling than an author's license permitted. It may not be the duty of the publisher to check up all the author's villains to free himself from the imputation of malice, but the jury may say that Howland, the second father of the book, should, from the nature of things, have been on his guard in a case like this.

Certain exceptions to defendant's requests to charge are also urged as error. In substance the requests are to the effect that plaintiff must establish malice as above defined in order to recover punitive damages. These requests were not read in the presence of the jury. They might, without error, have been charged as requested, but the principal charge, considered in its entirety, except as it submits to the jury the question of defendant's participation in Howard's purpose, fairly presents the principles of law applicable to the case. The refusals to

· charge as requested having made no impression on the minds of the jury, may be regarded as mere abstractions on the record and cannot be said to have been prejudicial under the circumstances and " the letter and the spirit of section 1317 of the Code of Civil Procedure." (*Cohalan* v. *New York Press Co., supra.*)

The judgment must, therefore, be reversed and a new trial granted, with costs to abide the event.

HISCOCK, Ch. J., COLLIN, McLAUGHLIN and ELKUS, JJ., concur; HOGAN, J., votes for affirmance under provisions of section 1317, Code of Civil Procedure; ANDREWS, J., votes for affirmance.

Judgment reversed, etc.