[redacted]

## HOLLAND FURNACE CO. v. ALLEN.

No. 8418.

Circuit Court of Appeals, Sixth Circuit.

April 8, 1941.

[redacted]

[redacted]

[redacted]

970

E. D. Alexander, of Grand Rapids, Mich. (Alexander, McCaslin & Cholette, of Grand Rapids, Mich., on the brief), for appellant.

George S. Norcross, of Grand Rapids, Mich. (Warner, Norcross & Judd, of Grand Rapids, Mich., on the brief), for appellee.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

HICKS, Circuit Judge.

Suit for conversion of 300 shares of common stock of appellant, Holland Furnace Company. The court hearing the case without a jury awarded damages in the sum of $8,524.48 and interest.

Appellee, Allen, was continuously employed in the sales department of the Company from November, 1926, to December, 1937, with the exception of a lay-off from January, 1933, to April, 1935.

In February, 1931, appellee purchased through the Company (it having advanced the money), 200 shares of its common stock at $31 per share, transferring to it as collateral 100 shares which he owned. His obligation to the Company, including brokerage charges, was $6,230. Up to August 1, 1933, he was credited with $1,350 but no further payments were made.

About September 27, 1935, the Company sold the 300 shares without notice to appellee, receiving $18 a share on 200 shares and $18⅛ a share for the remainder. It applied the proceeds on appellee's account and cancelled the deficit.

The court held that the sale, being without notice, violated Sections 9561–9563 of the Compiled Laws of Michigan, 1929. We quote Sec. 9561: "9561 *Sale of personal property collateral; notice.* Section 1. When stock, bonds, or other personal property is pledged as collateral security for the payment of money or the performance of any obligation, and there has been a default in such payment or performance, such stock, bonds or other personal property may

be sold to satisfy said debt or obligation at public sale, or at private sale where the contract of pledge authorizes a private sale; but before a sale, ten (10) days' notice in writing thereof shall first (1st) be served on the pledgor or his legal representative, either personally or by mail addressed to said pledgor or his legal representative at his last place of residence."

Appellee's purchase was made following the issuance by appellant over the signature of Landwehr, its sales manager, of Sales Department Bulletin No. 12, dated February 19, 1931. The bulletin was addressed to "Holland Furnace Company Employees" and outlined three plans for the purchase of stock. Deferred payment Plan No. 2 under which appellee applied for the 200 shares is as follows: "For every share of our stock now owned by you which you assign to us, we will buy two shares of our stock for you at the market, plus the brokerage charge to us. You are to pay us ⅓ of amount invested in stock purchased for you under this plan on or before June 1, 1932; ⅓ on or before June 1, 1933; balance on or before June 1, 1934. Interest, at six per cent per annum, is to be deducted quarterly out of dividends received on your stock, and balance of dividends is to be credited to your stock purchase account. Title to the stock deposited under this plan, as well as to stock purchased hereunder, shall remain in the Holland Furnace Company and/or its nominee until it is paid for in full or until it has been sold."

We quote two other paragraphs from Bulletin No. 12 as follows:

"In default of any payment by you when due, we reserve the right to sell, at the market, all of the stock held by us in your behalf, and to return the proceeds to you after deducting the amount you owe us.

\* \* \*

"Every Holland shareholder has received liberal interest on his investment, regardless of what he paid for the stock. 1930 was a difficult year in which to earn profits for most companies. Holland Furnace Company's earning record for 1930 was the second best year in the history of our company. Believing that the depression is beginning to fade away, and, taking into consideration that we will start a new year on April first, I feel enthusiastically optimistic over the future of our business. I believe in our product, and I believe in our Holland men. That is why I can recommend our stock as a good buy for an investment."

Pertinent portions of appellee's application for stock made in response to the bulletin follows:

"Application

"Holland Furnace Company,
"Holland, Michigan.

"Gentlemen:

"In accordance with Mr. E. G. Landwehr's Sales Department Bulletin No. 12, dated February 19, 1931, I desire to purchase Holland Furnace Company Common stock under the conditions therein, and for this purpose, I:—

"Inclose herewith 100 shares of Holland Furnace Company Common Stock, and make application to you to purchase in my behalf 200 shares of Holland Furnace Company Common Stock under Deferred Payment Plan No. 2.

"I understand that the option of accepting this application is entirely in the Holland Furnace Company.

"Dated, this 27 day of February, 1931.
"Yours very truly,
"Louis F. Allen."

Appellee's agreement with appellant must be found in the two documents from which we have just quoted. Appellant was a manufacturer and not a stock broker. It was to purchase stock for appellee from money advanced by it upon which appellee would pay interest out of dividends earned by the stock. The stock purchase, plus 100 additional shares, was put up as collateral to protect appellant. Appellee agreed to repay the money advanced in about three and a half years.

Obviously, no sale of the purchased stock on behalf of appellee was contemplated. Bulletin No. 12 recommended the stock "as a good buy for an investment" and we think that the transaction was considered an investment by the parties. If a sale were made it would be to protect appellant's advance, and not because of any contract, express or implied, to sell for the purchaser. The fact that appellant took title to the stock and retained the right to sell upon default did not affect the further fact that the stock was in the words of the statute "pledged as collateral security for the payment of money."

There is nothing in the contract providing the procedure in case of sale or indicating that there might be a private sale or that the debtor waived the statutory requirements for a sale. Wilkes v. Allegan Fruit & Produce Co., 233 Mich. 215, 206

N.W. 483. The contract was a Michigan contract, to be performed there, and is governed by Michigan law. Hence, by selling the stock without the statutory notice to appellee, appellant exercised an unauthorized dominion over it and a conversion resulted. Bennett v. Holland Furnace Co., 2 Cir., 116 F.2d 218. The statute, after all, is substantially an embodiment of the common law. Williston on Contracts, Rev.Ed., Vol. 4, sec. 1043, p. 2915; Edwards on Bailments, p. 248, et seq.

Appellant contends that appellee became acquainted with all the material facts in connection with the sale and failed to repudiate it for over two years and thereby ratified it as a matter of law. The court held that appellee did not ratify the conversion either expressly or by implication.

■ The law is that any purported ratification must have been made with knowledge of the material facts. Restatement of the Law of Agency, sec. 91; First Natl. Bank v. Alton Mercantile Co., et al., 8 Cir., 18 F.2d 213; Corrigan v. Bobbs-Merrill Co., 228 N.Y. 58, 126 N.E. 260, 10 A.L.R. 662; Myers v. Shipley, 140 Md. 380, 116 A. 645, 20 A.L.R. 1460.

■ Tahaney, Secretary and Assistant Treasurer of appellant, testified that appellant was carrying a half million dollars in defaulted stock-employee accounts such as appellee's, and Cheff, the General Manager, testified that when appellant's stock began to rise, the officers adopted the policy of selling out each account when the stock reached a high sufficient to liquidate it, or, as he put it, when the stock got "high enough to let us get out."

Appellee testified that he first learned of the sale on March 10, 1936, in the conversation with Tahaney to which we have referred; that he went to see about the conversion of some preferred stock which he owned. Appellee's testimony as to this conversation is unambiguous. The substance of it is quoted:

"A. 'Oh, there is another matter I would like to ask you about while I am here. Perhaps you can give me the information I want.' 'All right, Allen, what is it?' 'I have heard a rumor that the company has been selling out the stock purchased by Holland employees, and I am wondering if by any chance they may have sold me out.' He says: 'I think so, Allen.' He pulled a book from his desk, and referred to some record, and he said: 'Yes, they did sell you out.' And he stated the date.

"Q. Did he state the date some months prior to that, or do you recall the date he stated? A. I don't recall the date stated at the time.

"Q. All right, then what passed, or what was said? A. I said: 'That is funny, why did they sell me out?' He said: 'Lack of sufficient collateral.'

"Q. Yes. A. Why, I said: 'That seems strange to me. I had a hundred shares up, and I paid in a thousand dollars; then there was some interest credited, wasn't that enough to——?

"Q. (Interrupting.) You mean dividends? A. I meant 'dividends credited, wasn't that enough to protect the stock?' 'Well, Allen, you know interest has been accumulating until the interest has wiped out your——' I don't remember whether he said 'holdings' or 'equity,' I think he said.

"Q. Yes. A. 'And the interest was even more than—to the amount of $500 and some odd dollars.' Well, I said: 'That seems strange to me; I don't understand how that could be.' Then he showed this record where interest had been charged, and so on, and showed the balance. I said: 'It certainly seems funny to me, that if that was the condition the company didn't say something to me about it, either write me about it, so I could do something, or when I was in here at different times called me and discussed it.'

* * *

"The Court: I will take the answer.

"A. I said: 'Mr. Tahaney, isn't there anything I could do about it? Is there any way that I can do to protect myself on it?' He says: 'No, Allen; I am sorry, but nothing you can do about it.' I said: 'You mean then that the only thing to do is to take it on the chin and smile and forget it?' He said: 'I don't want you to feel that way about it, Allen. The company have felt that they have done the right thing. They have cancelled the excess interest charge against your account, and they feel they have done the square thing by you.' I said: 'Well, perhaps so, from their viewpoint, but I don't feel right about it. It seems to me they should have given me some chance to protect myself, but if there is nothing I can do, I suppose that is all there is to it.'"

From Tahaney's cross-examination it developed that appellant netted a profit of $551,000 for the quarter ending September, 1935, and that it reported a profit of $616,243 to the New York Stock Exchange. This was more than double the earnings for the corresponding quarter of the preceding year. It is true that Tahaney testified that the figures did not become available until late October, well after the sale date of appellee's stock, but he also testified that appellant received weekly reports from its branches. Whether appellant knew the exact figures or not, it must have been aware that it was having an exceptionally good quarter and it must also have been aware of the bullish effect the full report would have on the market, which reached a high of 30% before the year was out.

Appellee, who was in the sales department, no doubt became apprised in time of the earnings for that quarter, but there is no evidence that he was ever informed that at the very time he was sold out the officers of appellant had available information that must have led them to believe the stock would continue to advance for an appreciable period.

We think the evidence is sufficient to support the finding that there was no ratification. See Bennett v. Holland Furnace Co., supra (116 F.2d page 220), a case involving a situation similar to that here involved.

Appellant complains that the court applied an erroneous measure of damages. We think the contention is unsound. The highest price reached by the stock between the date of sale and the date of knowledge thereof by appellee was $44⅞ per share on February 19, 1936. This was higher than any price reached after appellee had notice. The court applied the rule that appellee was entitled to the highest market value, $44⅞ reached by the stock between the sale and a reasonable time after notice. This is the rule followed in Michigan. Wallace v. W. H. Noble & Co., 203 Mich. 58, 168 N.W. 984; Weaver v. Commercial Savings Bank, 222 Mich. 337, 192 N.W. 578.

There was no reversible error in the disallowance of appellant's counterclaim for interest upon the amount advanced. Bulletin No. 12 stated that interest would be deducted from dividends and the court ruled that it was not absolutely payable because no dividends accrued after 1932. Appellant says that it sent statements

to appellee in which interest was charged and that no protest was made and that the sales bulletin was just a letter filled with optimism. We cannot agree. It was reasonable for appellee to believe that the bulletin meant exactly what it said and that appellant was so sure of its earnings it was willing to take the risk of losing the interest which might be payable therefrom in order to widen its stockholdings among its employees.

The judgment is affirmed.