**Daniel FETLER, Plaintiff-Appellant,**

**v.**

**HOUGHTON MIFFLIN COMPANY, Defendant-Appellee.**

**No. 290, Docket 30123.**

United States Court of Appeals
Second Circuit.

Argued March 24, 1966.

Decided Aug. 15, 1966.

George G. Hunter, Jr., New York City, for plaintiff-appellant.

Edward N. Costikyan, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, Mark H. Alcott, New York City, on the brief), for defendant-appellee.

Before WATERMAN, MOORE and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

This appeal presents the narrow issue of whether a jury could reasonably find that an alleged libel refers to plaintiff Daniel Fetler. The alleged libel appears in the portrayal of the chief character Maxim in a novel entitled "The Travelers," written by plaintiff's brother Andrew Fetler. Plaintiff, who is a teacher and a lecturer, brought this libel action against Houghton Mifflin Company, the publisher of the novel. The book is the author's first novel; both he and defendant unquestionably regard the book as a serious work of creative fiction. Defendant moved in the trial court for judgment on various grounds; the one that principally concerns us here is the claim that the novel does not contain a portrayal of plaintiff. The district court, Harold R. Tyler, Jr., J., granted summary judgment to defendant, holding that "there is no significant and necessary identification of plaintiff with any fictional character in the novel." Judge Tyler found it unnecessary to reach the other questions raised by defendant's additional arguments below. For reasons set forth below, we reverse.

According to plaintiff, the novel is libelous because it allegedly shows Maxim, *inter alia*, as eagerly cooperating with a Nazi organization for easy money it paid him and, in frantic pursuit of money, abandoning his father on his death bed. Vigorously disputing this, defendant asserts that Maxim is portrayed as a sympathetic character. But since the trial court did not reach this issue, in considering the narrow question before us, we assume—but by no means do we decide or suggest—that the novel depicts Maxim in a defamatory way.

In order for a libelous statement to be actionable, the plaintiff must show that it was published "of and concerning" him. Julian v. American Business Consultants, Inc., 2 N.Y.2d 1, 17, 155 N.Y.S. 2d 1, 137 N.E.2d 16 (1956). Stated more fully, the question is whether

> the libel designates the plaintiff in such a way as to let those who knew him understand that he was the person meant. It is not necessary that all the world should understand the libel; it is sufficient if those who knew the plaintiff can make out that he is the person meant.

Miller v. Maxwell, 16 Wend. 9, 18 (N.Y. Sup.Ct.1836) (dismissing suit); accord, 1 Harper & James, Torts § 5.7 at 366 (1956); Restatement, Torts § 564, comment d. Moreover, that the author had no intention of portraying the plaintiff is no defense; it is merely a bar to the imposition of punitive damages. "The question is not so much who was aimed at as who was hit." Corrigan v. Bobbs-Merrill Co., 228 N.Y. 58, 64, 126 N.E. 260, 262, 10 A.L.R. 662 (1920) (dictum). To put the issue here in proper perspective, it must be emphasized that the ruling below deprived plaintiff of the opportunity to prove to a jury that the alleged libel was "of and concerning" him; the ruling was correct only if, on the undisputed facts, a jury could not reasonably conclude that Maxim in the novel is a portrayal of Daniel Fetler.

To prove that Maxim is actually himself, appellant offers the following similarities between the novel and fact: The novel depicts events in the life of the Solovyov family, composed of a father, mother, and thirteen children of whom ten are boys and the third, fourth and eighth are girls. This is the exact composition of the Fetler family. In the novel, Maxim is the eldest child and is twenty-three years old in 1938; in life, the same is true of plaintiff. In the novel, Maxim is a Latvian by birth; in fact, plaintiff, although born in Leningrad, was a Latvian citizen at the time the events in the novel occurred.[1] In the novel, the father is an itinerant Russian Protestant minister whose wife and children perform as a band and choir where the father preaches. Maxim is generally responsible for their temporal needs and to that end dominates them. The family travels about Europe in an old bus. In fact, plaintiff's father was a Russian Protestant (Baptist) minister; the rest of his family gave concerts as a family band and choir. Plaintiff looked after them, and they journeyed through Europe during the 1930's in an old bus. Both families bought homes in Stockholm. There are several other similarities as well. Finally, plaintiff stated in an affidavit opposing the motion below that his brother told him that the book, which he was then writing, "was about our father, the family concerts and me."[2]

On this statement of similarities it is difficult to see how a jury could be characterized as unreasonable if it found that Maxim could reasonably be understood as a portrayal of plaintiff Daniel Fetler. It is obvious that there are few, if any, other families with a minister father and thirteen children in which the third, fourth and eighth are girls and the eldest a son with great responsibility, who toured Europe in a bus in the 1930's giving family concerts.[3] Therefore, we

---

[1.] Although the papers disclose that there may be some dispute about plaintiff's citizenship, for the purposes of this appeal from summary judgment, plaintiff's averment of the fact will be assumed to be correct. Of course, a "genuine issue as to a material fact," see Fed.R.Civ.P. 56, makes summary judgment inappropriate.

[2.] The record indicates that the author may deny making this statement; but see note 1, supra.

[3.] Two recognized experts in the field have advised publishers wary of libel suits:
> At the risk of sounding facetious, one might lay down as a guiding principle the maxim that all first novels should be considered suspect. They tend to be autobiographical, and twentieth century fiction is replete with examples of writers whose first novel, at least, leaned heavily on the author's (usually unflattering) portrayal of and judgment on his family.

disagree with the district court's conclusion that the similarities set forth above did not "establish the necessary links 'between plaintiff and Maxim," unless other factors relied on below or urged by appellee on appeal compel a contrary result. Judge. Tyler relied upon two cases in granting summary judgment, Wheeler v. Dell Publishing Co., 300 F.2d 372 (7th Cir.1962), and Levey v. Warner Bros. Pictures Corp., 57 F.Supp. 40 (S.D.N.Y. 1944), and appellee cites others as controlling. Judge Tyler also reasoned that many passages of the novel negatived the effect of the similarities just discussed, and disregarded as conclusory affidavits submitted by plaintiff from various readers stating that they recognized Maxim to be the plaintiff. Finally, while properly recognizing it to be essentially self-serving, Judge Tyler gave some weight to a statement of the author emphasizing the fictional nature of the characters.

Taking the authorities first, neither of the cases relied on by the district court justifies summary judgment for defendant.[4] In Wheeler v. Dell Publishing Co., supra, plaintiffs Hazel Wheeler and Terry Ann Chenoweth claimed the novel and movie "Anatomy of a Murder" defamed them and invaded their privacy. There, as here, the novel and movie were based on actual occurrences, and indeed persons other than plaintiffs were apparently identifiable in the fictional works. However, in *Wheeler*, the author of the book had so clearly distinguished the physical traits and personality of Janice Quill in the novel from those of plaintiff Hazel Wheeler that the court could conclude that no one would consider the former a verbal portrayal of plaintiff.

Moreover, the court found that the role Janice Quill played in the novel was so minor that no average reader would remember it. The possibility of identifying plaintiff Terry Ann Chenoweth with her alleged portrayal in the movie and the novel was even less likely. In the movie, that character was the romantic lead and in the book she was sixteen at the time of the fictional trial; Terry Ann was in fact only nine years old when the incident portrayed actually occurred. In Levey v. Warner Bros. Pictures, Inc., supra, the plaintiff, George M. Cohan's first wife, claimed that a movie loosely based on his life portrayed her. After plaintiff's case had been presented at trial, the court concluded that the Mrs. Cohan of the film bore no resemblance to plaintiff, and that any similarities between events in the movie and in plaintiff's life were insignificant and incidental to the theme of the movie. In this case, unlike the situations in *Wheeler* and *Levey*, Maxim is a prominent character throughout the novel, events in the story and in life are often parallel, and plaintiff's description in numerous ways matches Maxim's. Moreover, the action in *Levey* was not for libel, but for violation of plaintiff's statutory right of privacy. N.Y.Civil Rights Law McKinney's Consol. Laws, c. 6, § 51. Since the statute is in part penal, the court considered itself bound to construe its terms strictly against plaintiff. See 57 F.Supp. at 42 and authorities cited therein. Whether the court was correct in its strict construction[5] is, of course, not germane to our inquiry into the basis for its decision.

---

* * * * *

Frequently merely changing some details of the character's background, occupation, marital status, or physical appearance might be sufficient to make identification improbable without at all hurting the literary values.

See Pilpel & Zavin, Rights and Writers: A Handbook of Literary and Entertainment Law 23, 25 (1960).

4. Although this is a diversity case, both parties have freely cited cases from ju-

risdictions other than New York. We assume that New York law controls but have considered all of the cases cited to us.

5. Compare, e. g., Manger v. Kree Institute of Electrolysis, Inc., 233 F.2d 5, 8 (2d Cir. 1956), and Spahn v. Julian Messner, Inc., 43 Misc.2d 219, 250 N.Y.S.2d 529 (Sup.Ct.1964), aff'd, 23 A.D.2d 216, 260 N.Y.S.2d 451 (App.Div.1965).

■ Appellee also cites to us authorities not relied on by the district court, e.g., Julian v. American Business Consultants, Inc., 2 N.Y.2d 1, 15–18, 155 N.Y. S.2d 1, 137 N.E.2d 1 (1956); Hays v. American Defense Soc'y, 252 N.Y. 266, 169 N.E. 380 (1929); Corr v. Sun Printing & Publishing Ass'n, 177 N.Y. 131, 69 N.E. 288 (1904); Seelman, Libel ¶¶ 108, 416 (1964). Appellant cites Corrigan v. Bobbs-Merrill Co., 228 N.Y. 58, 126 N.E. 260 (1920); Callahan v. Israels, 140 Misc. 295, 250 N.Y.S. 470 (Sup.Ct.1931); and Youssoupoff v. Metro-Goldwyn-Mayer Pictures, Ltd., 50 T.L.R. 581 (C.A. 1934). We agree that appellee's cases show that under the law of New York the burden on plaintiff to show that a statement is "of and concerning" him is not a light one; but these cases do not determine the issue here. In Corr v. Sun Printing & Publishing Ass'n, supra, there were no significant likenesses shown between the school teacher plaintiff and the femme-fatale pickpocket described in a newspaper story, apart from the coincidental similarity of names.[6] In Hays v. American Defense Soc'y, supra, plaintiff was named at most as a member of a group whose unspecified unidentified members could not sue. See 252 N.Y. at 272–276, 169 N.E. 380; Seelman, Libel ¶¶ 415–16 at 560 (1964). In Julian v. American Business Consultants, Inc., 2 N.Y.2d at 18, 155 N.Y.S.2d 1, 137 N.E. 2d 1, the court alternatively concluded that a reference to plaintiff by name in one part of a booklet, when read in context, could not reasonably be found to carry over to certain allegedly defamatory passages elsewhere. In the present case, there is no room for this conclusion; if there are references to plaintiff, they are only through the characterization of Maxim and the latter taken as a whole is either libelous or not. While plaintiff's authorities are similarly not conclusive, Corrigan v. Bobbs-Merrill Co., 228 N.Y. at 64–65, 126 N.E. 260, cited several famous examples of novels whose characters were very widely recognized as portrayals from life, and recognized that the plaintiff magistrate in that case had been defamed by the portrayal in a novel of a magistrate with a similar name.[7] Accord, Callahan v. Israels, 140 Misc. 295, 250 N.Y.S. 470 (Sup.Ct.1931); cf. Harwood Pharmacal Co. v. National Broadcasting Co., 9 N.Y.2d 460, 214 N.Y. S.2d 725, 174 N.E.2d 602 (1961).

■ The nub of the matter is that in this area the precise facts of the specific case must be carefully examined; on the record here, the cases do not indicate that summary judgment on the issue of identification was called for. Nor was grant of judgment on that basis justified by the other considerations relied on by the district court. The court below felt its determination buttressed by the many dissimilarities between plaintiff and Maxim, which plaintiff indeed characterized as "lies." On appeal, appellee argues in the same vein that the many dissimilarities in the novel destroy any reference the less numerous similarities might create alone. We cannot agree; at best, on this record, these dissimilarities pose an issue of fact as to identification, making summary judgment inappropriate. Nor were the four affidavits submitted by plaintiff from readers who recognized plaintiff in the novel so conclusory as to be incapable of raising an issue of fact.[8] Finally, there was no justification for any reliance by the district judge upon the effect of the usual disclaimer that the

---

6. Clare v. Farrell, 70 F.Supp. 276 (D.Minn. 1947), is distinguishable on the same ground. See also People on Complaint of Maggio v. Charles Scribner's Sons, 205 Misc. 818, 130 N.Y.S.2d 514 (Magis. Ct.1954).

7. A judgment for plaintiff on other grounds was reversed.

8. Plaintiff also submitted an affidavit stating that at least twelve of his students brought him a review of the book in a local newspaper and asked him if the book was about his family.

**654**

book should be read as fiction and that the characters are not biographical but purely imaginary. The record indicates that the copies of the book first sent to book dealers and the specific copy forming the basis of the complaint contain no such statement; later copies apparently did contain such a legend, but that should not affect the merits of this complaint on the issue now posed.

Accordingly, for all of the above reasons, we feel that summary judgment on the issue of identification was improper. In the trial court, defendant also moved for summary judgment on the ground that the portrayal of Maxim was, in any event, not defamatory and moved to dismiss the complaint for failure to state a claim on which relief could be granted because no special damages were pleaded. The district court did not reach these issues and can, of course, consider them upon remand; we emphasize that nothing said here implies a view on the merits of those issues. We are not unaware of the emotional overtones in this case where a brother claims his brother libeled him and most, if not all, members of a large family have become involved; nor do we discount the possibility that appellant's conclusion that he was defamed is irrational. We hold only that summary judgment on the issue of identification was improper on this record. Finally, defendant moved in the district court to strike the complaint because plaintiff's annotations in the copy of the novel attached thereto contained redundant, immaterial, impertinent and scandalous matter. Plaintiff claimed below that when the complaint was filed, the only copy of the book he had was the marked copy to which objection was made. He has made clear he is willing to substitute an unmarked copy and, accordingly, that should be done.

Judgment reversed and case remanded for proceedings consistent with this opinion.