OPINION OF THE COURT
Karen S. Smith, J.
From February 7, 2005 through March 28, 2005 this court tried the instant case before a jury in three phases. The first phase of the trial was to determine liability for damages suffered by the plaintiffs as a result of plaintiff Norma Rose having smoked cigarettes manufactured by defendants over a 46-year period. The second phase of the trial was to determine if there was sufficient evidence to impose punitive damages on defendants who were found liable in phase one of the trial. Phase three of the trial was to determine what amount, if any, should be imposed as punitive damages on defendants who were found liable for such damages in phase two of the trial.
At the commencement of the trial of this action and throughout the different phases of the trial, the parties made various motions in limine. The court considered the motions, issued *683 brief decisions from the bench and advised counsel for the parties that the court would provide written decisions setting forth the court’s reasoning behind its decisions. Because of the importance of this case and in an effort to provide the parties with a clear basis for 'the court’s determinations on their motions, the following are the decisions of this court with respect to the within motions in limine.
Plaintiffs in this action are Norma and Leonard Rose. Norma Rose smoked cigarettes from the time she was a teenager in 1947 up until 1993 when, after repeated efforts, she finally quit. Thereafter, she was diagnosed with lung cancer and perineoplastic cerebella degeneration (PCD). She commenced this litigation against defendant cigarette manufacturers for the damages she alleged to have suffered as a result of smoking their cigarettes. Her husband, Leonard Rose, brought a claim for loss of consortium as a result of his wife’s injuries. By the time the trial commenced, the only remaining cause of action was for negligent product design. The essence of plaintiffs’ cause of action was that defendants’ design of cigarettes with high tar and high nicotine content became negligent at the point in time: (1) defendants knew or should have known that (a) smoking high tar and high nicotine cigarettes increases the risk that a smoker will develop lung cancer, (b) smoking cigarettes is addictive, and (c) consuming less tar and nicotine reduces the risk of developing lung cancer, and (2) it became technologically feasible to make low tar and low nicotine cigarettes.
Plaintiffs Motion to Preclude Common Knowledge Evidence
Plaintiffs’ motion to preclude defendants from introducing evidence at phase one of the trial that the general public has been aware of the dangers of cigarette smoking, from at least 1969, was granted to the extent and for the reasons set forth herein.
Plaintiffs moved to preclude the introduction of evidence of the public’s awareness of the risks of cigarette smoking contending: (1) it was not relevant to the cause of action for negligent product design, and (2) it would be more prejudicial than probative.
Defendants contended that the jury had to be allowed to hear and consider evidence of the public’s awareness of the risks of cigarette smoking as such evidence was one of the factors which the New York State Court of Appeals has established to determine whether a product is not reasonably safe.
*684 The first issue to be addressed in a negligent product design case is whether the product in question is defective. A product is defective if it is not reasonably safe. In order to determine whether a product is not reasonably safe, it must be determined if the inherent risks in a product, as designed, outweigh its utility. (Voss v Black & Decker Mfg. Co., 59 NY2d 102, 109 [1983].) To make that determination, the Court of Appeals in Voss considered the following risk/utility factors:
“(1) the utility of the product to the public as a whole and to the individual user; (2) the nature of the product — that is, the likelihood that it will cause injury; (3) the availability of a safer design; (4) the potential for designing and manufacturing the product so that it is safer but remains functional and reasonably priced; (5) the ability of the plaintiff to have avoided injury by careful use of the product; (6) the degree of awareness of the potential danger of the product which reasonably can be attributed to the plaintiff; and (7) the manufacturer’s ability to spread any cost related to improving the safety of the design.” (Id. [citations omitted].)
While Voss was a strict liability case, defendants argued, nevertheless, that “[negligent design and strict products liability claims are treated as ‘functionally equivalent’ by New York courts, and the risk-utility analysis applies to both claims.” (Defendant’s brief regarding the admissibility of awareness evidence on plaintiff’s negligent design claim at 1.) Defendants argued that in the instant case the court is required to charge the jury with all seven factors and allow the jury to determine the relevance and weight of each factor in its deliberations. However, defendants’ argument ignored the precatory language in Voss in which the Court of Appeals stated: “In balancing the risks inherent in the product, as designed, against its utility and cost, the jury may consider several factors. Those factors may include the following” (id. [citations omitted and emphasis added]). More importantly the Court stated: “Pertinent factors in the individual case, when evaluated as to whether or not they are applicable, should form the basis for charging the jury as to how it should evaluate the evidence in order to decide whether a product is not reasonably safe.” (Id. [emphasis added].) In Denny v Ford Motor Co. (87 NY2d 248, 257 [1995]), the Court reiterated its position that such factors are discretionary and tailored to the facts of each case when it stated: “This standard demands inquiry into such factors as.” (Emphasis added.)
*685 Although courts have routinely cited Voss and Denny in connection with the risk/utility factors when considering products liability claims, there has been no indication from any court that each factor was intended to be assigned equal weight or that it is mandatory that all seven factors be considered in each and every case. While some cases simply list the seven factors with virtually no discussion or evaluation of the applicability of any given factor to the circumstances of the case (see e.g. Rainbow v Elia Bldg. Co., 79 AD2d 287, 291 [4th Dept 1981]; Jackson v Bomag GmbH, 225 AD2d 879, 881 [3d Dept 1996]), others recognize that there must be consideration of which factors are relevant to the particular case. In Fallon v Hannay & Son (153 AD2d 95, 99 [3d Dept 1989]), the Court made no reference to the seventh factor listed in Voss (the manufacturer’s ability to spread the cost of any safety-related design changes)[1] and specifically indicated that it was considering the factors that were “relevant here.” In Scarangella v Thomas Built Buses (93 NY2d 655, 659 [1999]), the Court of Appeals addressed the factors as follows:
“In Voss we identified seven nonexclusive factors to be considered in balancing the risks created by the product’s design against its utility and cost. As relevant here, these include the likelihood that the product will cause injury, the ability of the plaintiff to have avoided injury, the degree of awareness of the product’s dangers which reasonably can be attributed to the plaintiff, the usefulness of the product to the consumer as designed as compared to a safer design and the functional and monetary cost of using the alternative design. An additional pertinent factor that may be taken into account is ‘the likely effects of [liability for failure to adopt] the alternative design on . . . the range of consumer choice among products’ ” ([emphasis added and citations omitted], quoting Restatement [Third] of Products Liability § 2, Comment ƒ).
Fallon and Scarangella made it clear that the Voss/Denny risk/utility factors merely established a flexible set of guidelines for consideration depending upon the circumstances of each individual case. Furthermore, by considering the factors in the *686 context of their relevance to a particular case, the Court made it clear that the judge, rather than the jury, is the first arbiter of whether or not a given factor is applicable to a case presented to the court (since “relevance” is a determination to be made by the judge). Therefore, contrary to defendants’ assertions in the instant matter, there is no requirement that all seven of the risk/utility factors be presented for consideration by the jury in all products liability cases.
While public awareness of the dangers of cigarette smoking is relevant in a case premised on strict products liability, it has no relevance in a case premised on negligent design. This distinction was succinctly set forth in Gonzalez v Morflo Indus., Inc. (931 F Supp 159, 165 [ED NY 1996]) wherein the court stated:
“When a plaintiff asserts a design defect claim on a theory of negligence, the only difference in the inquiry is that in the negligence action, the jury must ask whether the manufacturer acted unreasonably in designing the product. That is, the focus shifts from whether the product, as designed, was not reasonably safe to whether the manufacturer was aware of that condition and chose to market the product anyway” (citing Voss, 59 NY2d at 107 [additional emphasis added]).
In the strict products liability action, the condition of the product itself, as it is offered in the marketplace, is the central issue. Thus, information generally known to the public concerning the condition of the product as it is offered in the marketplace has relevance. In the negligent product design action, the manufacturer’s knowledge of the condition of the product as designed and the manufacturer’s conduct in light of that knowledge are the central issues for consideration. Thus, public awareness of the dangers of a product would only be relevant and admissible in a negligent product design case when evidence exists that the manufacturers of the product reasonably relied upon the public’s awareness when making design decisions concerning the product.
Accordingly, plaintiffs’ motion to preclude defendants from introducing evidence of the general public’s awareness of the dangers of cigarette smoking was granted to the extent that defendants were precluded from introducing such evidence unless they first offered evidence to show that they made product design decisions in reasonable reliance upon the information available to the public.
*687 Plaintiffs’ Motion to Dismiss the Affirmative Defenses of Primary and Express Assumption of the Risk
Defendants’ answers included the affirmative defenses of “primary assumption of the risk” and “express assumption of the risk.” Plaintiffs moved to dismiss these affirmative defenses. Plaintiffs pointed out that the doctrine of primary assumption of the risk is limited to participation in recreational or sporting events where there is a commonly understood, elevated risk of danger inherent in the activity. (See e.g. Turcotte v Fell, 68 NY2d 432 [1986] [falling off of a horse when participating as a jockey in a horse race].) Plaintiffs argued that the courts have not and should not extend the doctrine beyond its limited purpose and application. With respect to express assumption of the risk, plaintiffs argued that the doctrine amounts to a contract or agreement between the parties pursuant to which, before engaging in an activity, the injured party is made fully aware of the inherent risks involved in the activity and the injured party, nevertheless, voluntarily agrees to undertake the activity. Plaintiffs contended that the doctrine does not apply because (1) there was never an express agreement between the parties, and (2) defendants did not make the risks of smoking clear to Ms. Rose prior to the time she became addicted to cigarettes.
With respect to primary assumption of the risk, defendants responded that smoking is a recreational activity with inherent elevated health risks which have been made known to everyone since 1969 when the federal government mandated that warnings be placed on every cigarette package sold in the United States. Defendants also pointed out that such warnings were made stronger in 1985 and were required to be included in every advertisement for tobacco products published in the United States. Defendants further argued that the doctrine of primary assumption of the risk has been extended by some courts beyond sporting activities to other activities involving elevated risks and, therefore, should, similarly, be applied to cigarette smoking. With respect to express assumption of the risk, defendants again pointed to the federally mandated warnings arguing that each time Ms. Rose bought a new package of cigarettes (or picked up the package to smoke another cigarette) she was advised of the inherent elevated health risks of smoking and voluntarily chose to engage in the activity notwithstanding those warnings. Therefore, defendants maintained that, with each new package of cigarettes Ms. Rose smoked, she *688 entered into a new express agreement to assume the health risks related to smoking.
The doctrine of primary assumption of the risk has not previously been determined to be applicable to smoking cigarettes by any court in the Appellate Division of the First Department. For the reasons stated below, this court also declined to extend the doctrine to the activity of cigarette smoking. The kinds of “recreational activities” which would be appropriate for the application of the doctrine of primary assumption of the risk are those activities which, similar to sporting activities, involve increased risks of immediate physical injury from an obvious or commonly understood source. “When the risks of the activity in question are perfectly obvious, the plaintiff is deemed to have consented to them and the defendant has satisfied its only duty of care — which is to make conditions as safe as they appear to be” (Hofflich v Mendell, 235 AD2d 784, 785 [3d Dept 1997] [citations omitted]). Examples would include rock climbing or parachuting. In either of those activities the potential dangers for immediate physical injury as a result of falling are or should be apparent to anyone who engages in the activities. Furthermore, when the activity is concluded, there is no longer any increased risk of injury.
In cases where the appellate courts have applied primary assumption of the risk to activities that were not, strictly speaking, sporting or recreational activities, the activities involved were physical activities, the elevated risks involved were clear, and the immediate risks of physical harm ended when the activity ended. (See Belloro v Chicoma, 8 AD3d 598 [2d Dept 2004] [where one ladder was stacked on top of another ladder in an attempt to reach a second story window]; Westerville v Cornell Univ., 291 AD2d 447 [2d Dept 2002] [in which a health care professional was injured by another participant in a training session during which the participants were practicing techniques to physically restrain agitated patients, the health care professional had substantial training in physical restraint techniques, many warnings of the potential for physical injury had been provided in the course materials, and the health care professional participated in the activity in spite of the warnings and risks]; Davis v Kellenberg Mem. High School, 284 AD2d 293 [2d Dept 2001] [where the plaintiff was injured while rocking a concrete bench by standing on it with other individuals and collectively shifting their weight back and forth].)
In Powell v Metropolitan Entertainment Co. (195 Misc 2d 847 [Sup Ct, NY County 2003]), another case cited by the defendants, *689 the court held that the doctrine applied to hearing impairments allegedly caused by attending a rock concert. Powell, however, is a lower court case and, as such, is not binding precedent on this court. The harm encountered by the plaintiff in Powell was a loss of hearing (physical harm) immediate to his attendance at a concert with extremely loud music. Additionally, the evidence in the Powell case indicated that the plaintiff, an educated person, had temporarily experienced similar effects from prior concerts he had attended, found the music at this particular concert to be so much louder than others he had attended that he “found the noise level intolerable” and went to an area in the building outside the concert hall where he could still hear the music (at 849). Under these circumstances, and in the absence of any concrete evidence of the actual volume of this concert, the court in Powell elected to apply the doctrine of primary assumption of the risk determining that the plaintiff had not been forced to attend the concert, had sufficient prior experience and knowledge to comprehend the likely consequences of his actions and, nevertheless, chose to remain at the concert. In sum, the injury involved in the Powell case was an immediate physical injury (impairment of hearing) that could be easily anticipated or appreciated by any ordinary individual who had attended live music performances without the necessity for additional explanation.
None of the cases cited by defendants which have applied the doctrine of primary assumption of the risk present circumstances similar to cigarette smoking. In the cases where the doctrine has been applied: (1) the activities involved increased risks which were immediate and obvious to an individual with common understanding and knowledge without any need for extrinsic explanation or clarification, (2) the risk of harm dissipated upon cessation of the activity, and (3) the resulting injuries occurred at the time the participant engaged in the activity. In contrast, cigarette smoking involves increased risks of harm which: (1) are not immediate (with the possible exception of being burned), and are not intuitively obvious, (2) do not immediately dissipate once the activity of smoking cigarettes is discontinued, and (3) result in injuries which, for the most part, do not occur until years after the smoker begins smoking cigarettes.
Moreover, the doctrine of primary assumption of the risk is premised upon the concept that the participant in the activity is free to choose whether or not to do so. In the present case, the *690 claim of addiction calls the voluntariness of the activity into question. By definition, one who suffers from addiction is compelled to continue an activity even though he or she knows the activity is detrimental. Therefore, even though a cigarette smoker may be made fully aware of the elevated risks, if he or she is addicted to smoking, he or she may not be making a free choice to participate in the activity of continued smoking.
Because of these differences, this court was not willing to extend the doctrine of primary assumption of the risk to cigarette smoking and determined that this affirmative defense should be dismissed.
As for the applicability of the doctrine of express assumption of the risk to the instant case, defendants argued that, each time Ms. Rose smoked another cigarette post-1969, when federal law required warnings concerning the health risks of smoking to be printed on the sides .of cigarette packages, Ms. Rose entered into a new, express agreement to assume the health risks related to smoking, based upon the warnings. Plaintiffs contended that Ms. Rose could not have entered into any express assumption of the risks associated with cigarette smoking because defendants never explained those risks to Ms. Rose and, in fact, defendants did everything they could to prevent the real risks of cigarette smoking from becoming known.
The position urged by defendants requires that, each time Ms. Rose smoked another cigarette, she be found to have freely and voluntarily made the choice to do so. However, if, as the plaintiffs contended, Ms. Rose became addicted to cigarettes prior to 1969 when the warnings became mandatory, she was not freely and voluntarily choosing to smoke. As has already been indicated, one who is addicted has lost the ability to make free choices concerning the substance of the addiction. Therefore, even if Ms. Rose received and comprehended the warnings beginning inl969, continuing to smoke cigarettes after that date may not evidence any willingness to assume an elevated risk but, instead, indicate nothing more than Ms. Rose’s inability to break her addiction. Thus the court reasoned that, if the jury determined that Ms. Rose was addicted to smoking cigarettes prior to 1969, express assumption of the risk does not apply. On the other hand, if the jury determined that Ms. Rose was not addicted to smoking cigarettes prior to 1969, she may have expressly assumed the risks of cigarette smoking. Accordingly, the court declined to dismiss the affirmative defense of express assumption of the risk prior to the parties’ presentation of their evidence at trial.
*691 Based upon all of the foregoing, the court granted the portion of plaintiffs’ motion to dismiss the defense of primary assumption of the risk but denied the portion of plaintiffs’ motion seeking to dismiss the defense of express assumption of the risk prior to trial, holding that the defense of express assumption of the risk could be considered by the jury depending upon the evidence on addiction presented by the parties at trial.
Defendants’ Motion to Dismiss Plaintiffs’ Cause of Action for Negligent Product Design on the Basis That the Claims are Barred by Federal Preemption
Defendants moved to dismiss plaintiffs’ cause of action for negligent product design contending that federal law precludes the assertion of negligent product design claims against cigarette manufacturers. Defendants maintained that “[u]nder the doctrine of ‘conflict preemption,’ any state law that conflicts with or stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress is preempted” (defendants’ mem of law regarding federal preemption at 18). The defendants, citing FDA v Brown & Williamson Tobacco Corp. (529 US 120, 137-139 [2000]), contended that:
“Congress . . . has foreclosed the removal of tobacco products from the market. . . [In addition to 7 USC § 1311 (a),] Congress has directly addressed the problem of tobacco and health through legislation on six occasions since 1965 . . . When Congress enacted these statutes, the adverse health consequences of tobacco use were well known, as were nicotine’s pharmacological effects . . . Nonetheless, Congress stopped well short of ordering a ban. Instead, it has generally regulated the labeling and advertisement of tobacco products, expressly providing that it is the policy of Congress that ‘commerce and the national economy may be . : . protected to the maximum extent consistent with’ consumers ‘be[ing] adequately informed about any adverse health effects.’ 15 U.S.C. § 1331. Congress’ decisions to regulate labeling and advertising and to adopt the express policy of protecting ‘commerce and the national economy ... to the maximum extent’ reveal its intent that tobacco products remain on the market.” (Defendants’ mem of law regarding federal preemption at 20.)
In further support of their position, defendants cited Insolia v *692 Philip Morris Inc. (128 F Supp 2d 1220 [WD Wis 2000]) and Cruz Vargas v R.J. Reynolds Tobacco Co. (218 F Supp 2d 109 [D PR 2002], affd 348 F3d 271 [1st Cir 2003]) as examples of cases which hold “that the plaintiffs could not ‘pursue a claim of negligence that rests on nothing more than the continued sale and manufacture of a dangerous product without any allegation of fault in the manufacturing or selling process.’ ” (Defendants’ mem of law regarding federal preemption at 22.)
The thrust of defendants’ preemption argument relied heavily upon statements in the FDA case concerning tobacco and the national economy. Those statements, in turn, relied upon portions of the Agricultural Adjustment Act of 1938 (contained in 7 USC § 1311).[2] 7 USC § 1311 (a) stated, in pertinent part, as follows:
“The marketing of tobacco constitutes one of the greatest basis industries of the United States with ramifying activities which directly affect interstate and foreign commerce at every point, and stable conditions therein are necessary to the general welfare. Tobacco produced for market is sold on a Nation-wide market and, with its products, moves almost wholly in interstate and foreign commerce from the producer to the ultimate consumer. The farmers producing such commodity are subject in their operations to uncontrollable natural causes, are widely scattered throughout the Nation, in many cases such farmers carry on their farming operations on borrowed money or leased lands, and are not so situated as to be able to organize effectively, as can labor and industry through unions and corporations enjoying Government protection and sanction. For these reasons among others, the farmers are unable without Federal assistance to control effectively the orderly marketing of such commodity with the result that abnormally excessive supplies thereof are produced and dumped indiscriminately on the Nation-wide market.”
Thus, as it related to tobacco products, the specific purpose of the Agricultural Adjustment Act of 1938 was to deal with the *693 vicissitudes of agriculture and to prevent “abnormally excessive supplies” of tobacco from being “dumped indiscriminately on the Nation-wide market.” Therefore, it is extremely important for this court to carefully consider the determination actually reached in the FDA case and the context of the statements made by the Supreme Court in order to avoid reaching an over-broad application of the holding in the case.
The FDA case was decided in connection with an attempt by the Food and Drug Administration (FDA) to regulate tobacco and tobacco products after many years of the FDA’s informing Congress that tobacco and tobacco products were beyond the FDA’s regulatory authority. Nonetheless, in 1996, the FDA issued final rules relating to the sale and distribution of tobacco and tobacco products to children and adolescents. The FDA contended that it had authority to do so pursuant to the Food, Drug and Cosmetic Act (hereafter referred to as the FDCA) because the FDA had determined that nicotine is a drug and that tobacco products are “drug delivery devices.” A group of entities involved in the tobacco industry instituted litigation challenging the FDA’s regulations arguing, inter alia, that the FDA lacked jurisdiction to regulate the marketing of tobacco products. The Supreme Court held that “the FDA’s claim to jurisdiction contravenes the clear intent of Congress.” (FDA, 529 US at 132.)
The focus of the controversy was the fact that, if the FDA applied the provisions of the FDCA to tobacco products, it would have been necessary to ban all tobacco products from the marketplace rather than merely regulating the sale and distribution of tobacco products to children and adolescents. Such a ban would have resulted, at least on a short-term basis, in a tremendous over-supply of tobacco and equally tremendous hardships on individual farmers who had been engaged in growing tobacco crops. Clearly this was precisely the type of hardship Congress had intended to prevent when it chose to include tobacco as a protected crop in the Agricultural Adjustment Act of 1938.
In reaching its decision, the Supreme Court specifically pointed out that, over the years, Congress had, on several occasions, considered and rejected bills to grant the FDA authority over tobacco products and, instead, opted to directly enact provisions concerning the labeling and marketing of tobacco and tobacco related products which accomplished much the same purpose as the regulations the FDA was attempting to promul *694 gate. The Court thus concluded that, by enacting legislation concerning the labeling and marketing of tobacco products,
“Congress expressly pre-empted any other regulation of the labeling of tobacco products concerning their health consequences, even though the oversight of labeling is central to the FDCA’s regulatory scheme. And in addressing the subject, Congress consistently evidenced its intent to preclude any federal agency from exercising significant policy-making authority in the area.” (Id. at 157.)
Defendants in the instant case argued that the doctrine of “conflict preemption” precludes negligence claims from being asserted against cigarette manufacturers because imposing liability upon them for tort claims pursuant to state law would enable state tort law to stand as an obstacle to Congress’s legislative purpose and objective of keeping tobacco products available for purchase by consumers in the United States. Defendants, however, ignore the context of the case which was being argued before the Supreme Court and the cautionary language set forth by the Supreme Court in its decision. In fact, the Supreme Court itself stated: “[O]ur inquiry into whether Congress has directly spoken to the precise question at issue is shaped, at least in some measure, by the nature of the question presented.” (Id. at 159.) Additionally, the Supreme Court pointed out: “[I]n our anxiety to effectuate the congressional purpose of protecting the public, we must take care not to extend the scope of the statute beyond the point where Congress indicated it would stop.” (Id. at 161 [citations omitted].) Accepting defendant’s position would result in precisely the type of extension the Supreme Court cautioned against. The Agricultural Adjustment Act of 1938 was clearly written to protect tobacco farmers from natural disasters and other potential market imbalances as opposed to protecting tobacco product manufacturers from injuries caused by their manufactured products.
Additionally, while Congress has continued to preempt any legislation or regulation by the states or any federal agencies which would be contrary to the requirements set forth in the Federal Cigarette Labeling and Advertising Act, nothing presented to this court or contained in that legislation indicates it was intended to have any greater impact than that which is set forth in its declaration of policy and purpose. In pertinent part, the act states:
*695 “It is the policy of the Congress, and the purpose of this chapter [15 USC § 1331 et seq.], to establish a comprehensive Federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health, whereby—
“(1) the public may be adequately informed about any adverse health effects of cigarette smoking by inclusion of warning notices on each package of cigarettes and in each advertisement of cigarettes; and
“(2) commerce and the national economy may be (A) protected to the maximum extent consistent with this declared policy and (B) not impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health.” (15 USC § 1331.)
The policy statement set forth above contains no explicit provisions absolving cigarette manufacturers from liability for injuries caused by their products. The policy provisions of the act contain specific language defining a purpose of balancing the need for health related information with respect to a specific product in national commerce against the confusion and complexity that would be generated if individual states or various federal agencies each created their own regulatory scheme of warnings or labels for that product. As the Supreme Court indicated in the FDA case, “ ‘it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.’ ” (FDA, 529 US at 147, quoting Oncale v Sundowner Offshore Services, Inc., 523 US 75, 79 [1998].)
Finally, at least with respect to the sole claim remaining before this court (negligent product design), the very cases cited by defendants, Insolia and Cruz Vargas, support the conclusion that a state law tort cause of action for negligent product design survives federal preemption. In Insolia, while the court specifically made reference to the language set forth in 7 USC § 1311 (a), the court allowed the plaintiffs to amend their complaint to assert a claim for negligent design of cigarettes based upon the theory that the cigarette manufacturers “were negligent in failing to design a cigarette product that was non-addictive and less harmful to health.” (Insolia, 128 F Supp 2d at 1227.) In Cruz Vargas, the court specifically mentioned the language of 7 USC § 1311 (a) and, based upon said language, stated: “Plaintiffs are *696 barred from pursuing a state-law tort claim based exclusively on the theory that Defendant Reynolds manufactured and sold cigarettes.” (Cruz Vargas, 218 F Supp 2d at 118.) However, as to plaintiffs’ claim for defective product design under a negligence theory, the court did not address the subject of conflict preemption. Instead, the court granted defendants’ summary judgment motion dismissing the claim stating:
“Here Plaintiffs have not proffered any evidence regarding the applicable standard of care for designing cigarettes or how Defendant Reynolds purportedly fell below such a standard. Therefore, to the extent that Plaintiffs are arguing that Defendant Reynolds negligently designed its cigarettes, we find that the Plaintiffs have not created a genuine issue of material fact as to these claims, and Defendant Reynolds is entitled to summary judgment.” (Id. at 119.)
Thus, the Cruz Vargas court allowed the defective design claim to stand in the face of defendants’ defense of conflict preemption and, instead, granted defendants’ summary judgment motion by reason of the plaintiffs’ failure to raise material issues of fact.
Accordingly, this court found defendants’ argument that federal conflict preemption precluded the assertion against cigarette manufacturers of tort claims for negligent product design under state law to be without merit and denied defendants’ motion to dismiss plaintiffs’ cause of action for negligent product design.
Evidentiary Ruling on Admissibility of Evidence Concerning Commercial Viability of Safer Alternative Design Cigarettes
An essential element of plaintiffs’ cause of action for negligent product design is that a safer alternative design to the cigarettes being marketed by defendants was feasible at the time Ms. Rose used defendants’ products. During phase one of the trial, the court ruled that for plaintiffs to sustain their burden of proof, they needed to prove that a safer alternative design was technologically feasible, i.e., defendants had the capability of manufacturing the alternative design at the time Ms. Rose smoked the various defendants’ cigarettes.
Defendants contended that they should be allowed to offer evidence tending to prove that the “safer alternative design” suggested by plaintiffs was not feasible because it was not accept *697 able to consumers (i.e., not commercially viable). The evidence defendants sought to admit consisted of sales and market data as well as consumer complaints indicating that, when defendants offered the alternatively designed (i.e., low tar and nicotine) cigarettes in the marketplace, consumers did not like them and did not purchase them but, instead, continued to purchase the higher tar/nicotine cigarettes which were then being sold by defendants. Defendants argued that (1) a cigarette’s function is to provide taste, comfort, relaxation and other subjective factors to smokers, and (2) unless the alternatively designed product provided those things to consumers, the alternatively designed products would not be acceptable to consumers, and thus not commercially viable and, therefore, not feasible to produce. To support their argument, defendants offered the testimony of Dr. Sharon Blackie, as an expert witness, to the effect that, when lower tar/nicotine cigarettes were first introduced, consumers complained and would not accept the lower tar/nicotine cigarettes.
Plaintiffs countered that New York case law defines “feasibility” as the technological ability to produce the alternative design at a cost that is not substantially disparate to the cost of the original product, and “functionality” as the actual ability of the product to function in a fashion that is similar to the original product. Plaintiffs argued that, pursuant to New York case law on this subject, “feasibility” relates solely to the technological ability of the tobacco companies to make the safer alternative design cigarette and has no relationship to whether or not the companies choose to place an alternatively designed product on the market or whether or not the product is, in fact, successfully marketed. Plaintiffs also argued that a functional cigarette is one which will allow a smoker to inhale smoke from the end of the cigarette placed in his or her mouth when the other end is ignited.
None of the New York cases (in either federal or state court) which have been offered by defendants support the position that the commercial viability of the proposed alternatively designed product is relevant to the determination of whether or not said design is “feasible.” Even those cases referring to “economic” feasibility relate solely to the cost of designing the product, not the acceptability of the product to the public. (See Friedman v National Presto Indus., Inc., 566 F Supp 762, 764 [ED NY 1983].) The economics in such cases relate to whether or not the expense of the alternate design is justified by increases *698 in safety. Therefore, to meet the burden of proving the feasibility of the safer, alternative design a plaintiff must demonstrate the technological feasibility of the “design,” not its commercial viability. As the District Court for the Southern District of New York stated in Rypkema v Time Mfg. Co. (263 F Supp 2d 687, 692 [SD NY 2003]):
“There are two means of satisfying this burden:
“1. Plaintiffs expert can show, through testing and construction of a prototype, that such an alternative design is within the realm of practical engineering feasibility, thereby demonstrating the utility, cost, safety, sanitation and other characteristics of the proposed alternative; and/or
“2. Plaintiffs expert can identify makers of similar equipment who have already put into use the alternative design that has been proposed.” (See also Colon v BIC USA, Inc., 199 F Supp 2d 53, 76-77 [SD NY 2001] [which lists numerous federal cases rejecting expert testimony concerning various alternative designs because the expert had not offered a prototype or other indication of testing of the alternative design].)
Neither of the two alternatives listed in Rypkema contains any indication that commercial viability of the alternative design is relevant to whether or not it is a feasible design.
Defendants’ attempt to define a cigarette’s function in terms of the subjective benefits, which they claim motivate consumers to use cigarettes, is also misdirected. A saw or knife cuts wood and a gun shoots bullets. While the users of those products may derive many subjective benefits which motivate them to use the products (such as the pride of producing a work of art or a piece of furniture, or the prestige and notoriety of being an expert marksman), those benefits do not alter the function of the product. A cigarette’s function is to be lit, burned and inhaled.
Moreover, notwithstanding defendants’ attempts through their arguments and Dr. Blackie’s testimony to link consumer acceptance of cigarettes to their function, upon cross-examination Dr. Blackie admitted: “You train the consumer to accept new products.” (Transcript of trial, at 3147, lines 18-19.) Thus, it cannot be said that consumer acceptance or the commercial viability of an alternatively designed product has any relevance to its function or to whether or not the product’s manufacturer acted reasonably by continuing to market the *699 product in its unsafe condition when the manufacturer could have produced a safer, alternatively designed product.
Accordingly, this court ruled that evidence concerning the commercial viability of safer, alternatively designed products was inadmissable as being irrelevant to the issue of whether or not the safer alternative design was feasible or functional.
Defendants Philip Morris USA, Inc.’s and Brown & Williamson Tobacco Corporation’s Motion for Special Additional Jury Instructions
Prior to the second phase of the trial, defendants submitted a proposed punitive damage instruction (court exhibit 57). Included in the proposed instruction was the following language:
“You will recall that I instructed you that, in considering a Defendant’s liability for damages to compensate Mrs. Rose for her injuries, you needed to find that the elements of Mrs. Rose’s claims were established by a preponderance of the evidence — in other words, that they were more likely than not. A different and more demanding standard applies to liability for punitive damages, which must be proved by clear and convincing evidence. This means evidence that satisfies you that there is a high degree of probability that a Defendant’s actions were wanton and reckless, or malicious, as I have defined those terms for you.
“Put another way, to decide for Mrs. Rose, it is not enough to find that the preponderance of the evidence is in Mrs. Rose’s favor. A party who must prove her case by a preponderance of the evidence only need satisfy you that the evidence supporting her case more nearly represents what actually happened than the evidence which is opposed to it. But a party who must establish her case by clear and convincing evidence must satisfy you that the evidence makes it highly probable that what she claims is what actually happened.
“Because the burden of proof that Mrs. Rose must satisfy is greater for punitive than for compensatory damages, it would not be inconsistent for you to find, for example, that a Defendant committed negligence for purposes of requiring it to pay compensatory damages but not for purposes of subjecting it to punitive damages.”
*700 Defendants contended that this was a necessary instruction as the burden of proof required to sustain a finding of entitlement to punitive damages is proof by “clear and convincing evidence.” Plaintiffs contended that, in the instant case, plaintiff only need prove its entitlement to punitive damages based on a “preponderance of evidence.” For the reasons set forth herein, the court denied defendants’ request to charge clear and convincing evidence as the standard for punitive damages in this case and instead charged the jury that the burden of proof required a finding by a preponderance of the evidence.
To support their claim, defendants cited Sladick v Hudson Gen. Corp. (226 AD2d 263 [1st Dept 1996]), Orange & Rockland Util, v Muggs Pub (292 AD2d 580 [2d Dept 2002]), and Camillo v Geer (185 AD2d 192 [1st Dept 1992]). Each of these cases applied the “clear and convincing” evidentiary standard for awarding punitive damages. To support their position, plaintiffs cited Greenbaum v Svenska Handelsbanken, NY (979 F Supp 973 [SD NY 1997]). In that case the court applied the “preponderance of the evidence” standard in reviewing an award of punitive damages. A review of the different courts’ bases for applying these standards revealed some confusion concerning the proper evidentiary standard on the question of punitive damages that needed to be resolved before this motion could be decided.
The confusion arose from two conflicting New York Court of Appeals cases. In Cleghorn v New York Cent. & Hudson Riv. R.R. Co. (56 NY 44, 48 [1874]), the Court stated that conduct warranting punitive damages must be “clearly established.” The issue before the Court in Cleghorn was whether the trial court had properly instructed the jury on the question of awarding punitive damages against defendant railroad company for injuries caused by its employee, a switchman who was intoxicated at the time of the accident. In its charge on damages, the trial court had given the following instruction: “[Y]ou may add such sum for exemplary damages as the case calls for; depending in great measure of course upon the conduct of the defendant.” (Id. at 47.) The Court of Appeals set aside the verdict on the ground that the instruction had been insufficient as a matter of law. In reaching its determination, the Court articulated the following rule:
“For injuries by the negligence of a servant while engaged in the business of the master, within the scope of his employment, the latter is liable for *701 compensatory damages; but for such negligence, however gross or culpable, he is not liable to be punished in punitive damages unless he is also chargeable with gross misconduct. Such misconduct may be established by showing that the act of the servant was authorized or ratified, or that the master employed or retained the servant, knowing that he was incompetent, or, from bad habits, unfit for the position he occupied. Something more than ordinary negligence is requisite; it must be reckless and of a criminal nature, and clearly established.” (Id. at 47-48.)
It is not clear from the language of the decision whether the Court intended that proof on the question of punitive damages must be “clearly established” in all cases, or only when punitive damages are sought against an employer on a theory of respondeat superior.
The Court of Appeals for the Second Circuit and the First and Second Departments of the Appellate Division in New York have all cited Cleghorn to hold that the standard of proof in a punitive damages case must be met by clear and convincing evidence. (Roginsky v Richardson-Merrell, Inc., 378 F2d 832, 851 [2d Cir 1967]; Camillo, 185 AD2d at 194; Orange & Rockland Util., 292 AD2d at 581.) However, as in Cleghorn, it is unclear whether these rulings apply to all punitive damages cases, or only those that involve imposing punitive damages where liability is based on respondeat superior. A central issue in each of the cases citing Cleghorn was whether punitive damages could be imposed on a corporation for the acts of its employees. In Roginsky, a products liability case concerning a cholesterol control drug that caused cataracts, the court found that, while certain members of defendant’s research department had falsified animal test results, there was no evidence that either of the two corporate officers with direct decision-making authority in the matter, or anyone above them knew of the falsified results. (Roginsky, 378 F2d at 844-845.) As such, the court concluded there was no showing that directors or senior officers of the corporation, and consequently the corporation itself, acted in a reckless manner. (Id. at 846.) Accordingly, the court set aside a punitive damages award in that case. In Camillo, the issue before the Court was whether the defendant, a parent company of a corporation which assembled and distributed crane parts, was liable for punitive damages when it failed to sufficiently act upon a warning that certain elements of a crane manufactured *702 by its subsidiary were shown to be defective. (Camillo, 185 AD2d at 194-196.) The Court found that, prior to the event causing plaintiffs injuries, only two employees of defendant knew of the warning and neither had the requisite decision-making authority to remedy the problem. (Id. at 196.) As such, the Court concluded that their conduct could not support a punitive damages award against defendant. (Id.) In Orange & Rockland Util., while it did not set forth the specific facts underlying the claim, the Court stated clearly that the lower court had properly set aside the punitive damages award on defendant’s counterclaim against the corporate plaintiff where “the plaintiffs employees who testified during trial were not superior officers within the plaintiffs company because they did not possess a high level of general managerial authority in relation to the nature and operation of the plaintiffs business.” (Orange & Rockland Util., 292 AD2d at 581.)
The second New York Court of Appeals case to address the issue, decided after Cleghorn, is Corrigan v Bobbs-Merrill Co. (228 NY 58 [1920]). In that case, a libel case, the issue before the Court was whether the plaintiff had established by sufficient evidence his entitlement to punitive damages against a defendant publishing company that had published a libelous novel. In its ruling, the Court stated that, to establish entitlement to punitive damages, the plaintiff must show that defendant published the defamatory statement with malice, as defined by ill will toward defendant or conscious indifference to the harm publication of the novel may cause, and that plaintiff must establish defendant’s malice by a “fair preponderance of the evidence.” (Id. at 66.) The Court cited no authority for this rule and made no mention of the higher standard it had previously set forth in Cleghorn. The Appellate Division, Fourth Department, and the United States District Court for the Southern District of New York have cited Corrigan to hold that the relative standard for punitive damages is a preponderance of the evidence. (Matter of Seventh Jud. Dist. Asbestos Litig., 190 AD2d 1068, 1069 [4th Dept 1993]; Greenbaum, 979 F Supp at 982.)
In Greenbaum, the court noted the inconsistency between Cleghorn and Corrigan and concluded that a preponderance of the evidence standard was the correct standard on which to instruct the jury for a punitive damages claim arising out of a sexual harassment cause of action. In Greenbaum, the court analyzed the contradictory Court of Appeals rulings and made *703 the following two observations: first, the Court in Cleghorn seemed more concerned with the substantive standard of conduct necessary to establish entitlement to punitive damages and less with the quality of evidence necessary to establish that conduct; second, Corrigan was decided more than 40 years after Cleghorn. (Greenbaum, 979 F Supp at 977-978.) The court concluded that Corrigan should control, if for no other reason than it was the more recently decided of the two. (Id. at 978.)
The court, in Greenbaum, went on to state another more compelling reason why the “preponderance of the evidence” is the appropriate standard. The court observed that, under New York law, a claim for punitive damages is “inextricably linked to the underlying cause of action” and cannot stand on its own. (Id. at 982, citing Rocanova v Equitable Life Assur. Socy. of U.S., 83 NY2d 603, 616-617 [1994].) Accordingly, the court in Greenbaum concluded that the level of proof necessary to establish punitive damages must be the same as the level required to establish the underlying claim, as it would make little sense to require a plaintiff to show proof of certain damages by clear and convincing evidence and other damages by a mere preponderance of the evidence. (Greenbaum, 979 F Supp at 982.) The Greenbaum court cited New York libel cases that contained punitive damage elements to illustrate this point. In Corrigan and Frechette v Special Mags. (285 App Div 174, 176-177 [3d Dept 1954]), the Courts held that entitlement to punitive damages on a claim for libel must be shown by a preponderance of the evidence. Both of these cases were decided before the United States Supreme Court issued its decision in New York Times Co. v Sullivan (376 US 254, 280 [1964]), which required that libel must be established by clear and convincing evidence. In Mahoney v Adirondack Publ. Co. (71 NY2d 31, 40 [1987]), the New York Court of Appeals held that entitlement to both compensatory and punitive damages in a libel case must be shown by clear and convincing evidence. The court in Greenbaum concluded that the fact that the standard for punitive damages in libel changed with the standard for compensatory damages indicated that the requisite standard for punitive damages was not fixed at clear and convincing evidence, but was the same standard as the underlying claim. (979 F Supp at 982.)
The holdings in Roginsky, Gamillo, and Orange & Rockland Util, are not inconsistent with this rule. Rather, those cases can be read as carving out a special exception to the rule articulated in Greenbaum. As noted above, each of those cases *704 turned on the issue of whether the conduct of a corporate defendant’s employee could be imputed on the corporate defendant for the purposes of awarding punitive damages against that defendant. In such cases, there is a high risk that a corporate defendant may be punished for conduct it did not intend or sanction. Accordingly, a higher standard of proof would be appropriate in those cases to avoid those risks. The rule articulated by the Court of Appeals in Cleghorn, upon which these cases rely, reflects that concern.
When there is no question that officers or directors with decision-making authority directed or sanctioned the alleged tortious conduct, this risk is not present. Accordingly, no such rule is needed. For example, in Corrigan, establishing entitlement to punitive damages did not turn on whether a corporation was liable for a tort on a theory of respondeat superior, but instead on whether a defendant corporation itself had acted with malice when it published a libelous novel. (228 NY at 66-67.) As such, there was no risk that defendant would have been punished for the unauthorized acts of an employee.[3] Like Corrigan, there was no dispute in the instant case that the alleged tortious acts were directed or sanctioned by officers of defendants Phillip Morris USA, Inc. and Brown & Williamson Tobacco Corporation. Accordingly, the heightened protection of the “clear and convincing” standard is not applicable.
Defendants argued that, regardless of the Court of Appeals ruling in Corrigan, this court is bound by the clear language of the Appellate Division, First Department, in Sladick and Camillo, which states that punitive damages awards must be supported by “clear, unequivocal and convincing evidence.” (Sladick, 226 AD2d at 264; Camillo, 185 AD2d at 194.) However, as noted above, the Camillo court’s use of the “clear and convincing” evidentiary standard arose out of circumstances in that case not present here, and is thus not controlling in the *705 instant case. In Sladick, the Court cites Camillo for the proposition that entitlement to punitive damages must be established by clear and convincing evidence. (226 AD2d at 264.) However, the decision simply states that plaintiff had not established entitlement to punitive damages and offers no details on the issue. (Id.) Specifically, it makes no mention of whether a punitive damages award was sought against defendant corporation for acts of its employee. Thus, it is impossible to tell whether the Appellate Division, First Department, simply applied the rule because the facts were similar to those in Camillo or that it intended to broaden the “clear and convincing” evidentiary standard to all punitive damages cases. If this court were reading Sladick in a vacuum, it might be convinced that “clear and convincing” evidence was the only applicable standard on the issue of punitive damages. However, in light of the differing Court of Appeals decisions discussed above, as well as the lack of any detail in the Sladick decision on the punitive damages issue, this court did not find Sladick to be controlling in the instant case.
For the reasons set forth above, this court adopted the rule, set forth in Greenbaum, that the burden of proof for punitive damages in a negligent design case is the same as the burden of proof for compensatory damages in a negligent design case. In a negligence action, prima facie entitlement to compensatory damages must be established by a fair preponderance of the evidence. (Rinaldi & Sons v Wells Fargo Alarm Serv., 39 NY2d 191, 196 [1976].) Therefore, the court denied defendants’ motion to instruct the jury that entitlement to punitive damages must be established by clear and convincing evidence.
Defendants’ Motion to Exclude Evidence of Their Financial Condition From the Punitive Damages Phase of the Trial
At the second phase of the trial, defendants Phillip Morris USA, Inc. and Brown & Williamson Tobacco Corporation moved to preclude all evidence of their profits and financial status. The court denied their motion.
Defendants raised three separate arguments to support their motion. First, they contended that due process principles prohibit consideration of a defendant’s wealth as a factor in determining the amount of a punitive damages award; second, they contended that evidence of a corporation’s wealth and financial status has no relevance to the question of the appropriate amount of punitive damages; and third, they argued that *706 the probative value of any such evidence is greatly outweighed by its prejudicial effect on the jury. Defendants further requested that, if the court should allow plaintiffs to introduce financial evidence, the jury be instructed that it may not proportion its award to defendants’ financial conditions, or otherwise enhance the award based on their wealth.
As to their first argument, defendants cited three United States Supreme Court cases for the principle that the US Constitution forbids juries from using a corporate defendant’s financial status in determining the amount of punitive damages. (State Farm Mut. Automobile Ins. Co. v Campbell, 538 US 408 [2003]; Cooper Industries, Inc. v Leatherman Tool Group, Inc., 532 US 424 [2001]; BMW of North America, Inc. v Gore, 517 US 559 [1996].) While these cases place certain due process limitations on the size of punitive damages awards, none of them goes so far as to foreclose consideration of a defendant’s financial status in determining the amount of a punitive damages award.
In Gore, the Supreme Court reviewed a punitive damages award against a defendant national automobile distributor which had failed to disclose to the purchaser that it had repainted the car plaintiff bought (Gore, 517 US at 562-563). The Court found that, where the plaintiff had only suffered $4,000 worth of actual damages, a $2 million punitive damages award was grossly excessive and violated the Due Process Clause of the Fourteenth Amendment. At the outset of its analysis, the Supreme Court noted that:
“Punitive damages may properly be imposed to further a State’s legitimate interests in punishing unlawful conduct and deterring its repetition . . . Only when an award can fairly be categorized as ‘grossly excessive’ in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment.” (Id. at 568.)
To determine whether an award violates due process, the Court articulated three guideposts: “[T]he degree of reprehensibility of the [conduct in question]; the disparity between the harm or potential harm suffered by [plaintiff] and his punitive damage award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases.” (Id. at 575.) In applying these guideposts to the facts in the case, the Court held that the award violated due process. As to the first *707 guidepost, the Court found that BMW’s policy concerning disclosure of presale repairs to its automobiles, which complied with the strictest state statute governing such disclosures, was not of such a reprehensible nature as to warrant the $2 million award. (Id. at 578, 580.) As for the second guidepost, the Court noted that the punitive-to-compensatory damages award ratio was 500 to 1 and there was no showing that the potential harm to plaintiff was any greater than plaintiffs actual harm. (Id. at 582.) For the third guidepost, the Court found that the punitive damages award was well in excess of statutory fines imposed by states for similar conduct, which ranged from $50 to $10,000. (Id. at 584.) Since the $2 million punitive damages award in this case went well astray from each guidepost, the Court concluded that it was overly excessive and thus violated due process. (Id. at 585.) After finding the award unconstitutional, the Court did express concern that a corporate defendant’s wealth could be used to justify a punitive damages award, but only to the extent that it would be used to justify an otherwise unconstitutional award. (Id.)
In Cooper Industries, the Supreme Court held that the Court of Appeals should apply a de novo standard in reviewing district court determinations on the constitutionality of punitive damages awards. (Cooper Industries, 532 US at 426.) The Court reiterated the Gore guideposts as the relevant factors the circuit courts should consider in their review. (Id. at 439.) The defendant corporation’s wealth was not an issue in the Court’s decision.
In State Farm, the Court once again applied the guideposts it set down in Gore to vacate a $145 million punitive damage award against a corporate defendant. (State Farm, 538 US at 429.) The injury in question was emotional distress caused by the defendant insurer’s unwillingness to settle an automobile accident claim. The jury awarded plaintiffs $1 million in compensatory damages for their injuries. In its determination, the Supreme Court found that the award ran afoul of each of the Gore guideposts. With regard to the first guidepost, the Court found that, while defendant’s conduct toward the plaintiffs was not worthy of praise, it was not so reprehensible as to warrant the $145 million award. (Id. at 419-420.) The Court also noted that most of the evidence introduced concerned defendant’s nationwide practices and policies, and had little relation to the tortious conduct directed toward defendants. (Id. at 420-425.) With regard to the second guidepost, the Court found that there is a presumption against a 145 to 1 punitive- *708 to-actual damages ratio. (Id. at 426.) It further noted that compensatory damages in emotional distress cases frequently include punitive elements already, so that the punitive-to-actual ratio may be even higher. (Id.) As to the third guidepost, the Court found that the only relevant state civil sanction was a $10,000 fine for the act of fraud. (Id. at 428.) In its analysis, the Court noted that “[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award.” (Id. at 427 [emphasis added].)
Contrary to defendants’ arguments, nothing in these cases forecloses consideration of a defendant’s wealth in assigning a punitive damages award. As the Court noted in Gore, a state has a legitimate interest in imposing punitive damages on conduct within certain guidelines. Accordingly, juries considering state common-law tort actions should be free to consider relevant and material evidence in making their determinations as to what is appropriate to punish the conduct and deter its repetition. That the Supreme Court did not include a defendant’s financial status among the Gore guideposts does not mean that the Constitution prohibits financial status from consideration. The guideposts laid out in Gore are not rules of evidence. They only apply when, after a punitive damages award has been made, a question arises of whether that award is so overly excessive that it offends due process of law. While the Supreme Court in Gore and State Farm frowned on the use of a corporate defendant’s wealth as justification for a punitive damages award, it did so only because wealth was used to justify otherwise unconstitutionally excessive awards. It did not hold that it was constitutionally impermissible to use wealth as a factor in determining the amount of the award. Since the Constitution does not prohibit a jury from considering a defendant’s wealth when fixing a punitive damages award, the court held that this portion of defendants’ motion was without merit.
Defendants’ argument that evidence of their financial condition was irrelevant to the question of punitive damages was likewise without merit. Defendants argued that, while the wealth of an individual may be relevant to the question of deterrence, a corporation’s “wealth” is different than that of an individual’s and, as such, it is an inappropriate factor to consider in determining punitive damages awards.
Punitive damages serve “as a punishment of the defendant for the wrong in a particular case, and for the protection of the public against similar acts, to deter the defendant from a repetí *709 tion of the wrongful act, and to serve as a warning to others.” (Le Mistral, Inc. v Columbia Broadcasting Sys., 61 AD2d 491, 494 [1st Dept 1978].) A defendant’s wealth is relevant to the amount of the punitive damages award, to ensure that the award carries the proper punishment and deterrent effect. (Rupert v Sellers, 48 AD2d 265, 269-270 [4th Dept 1975]; see also McIntyre v Manhattan Ford, Lincoln-Mercury, 256 AD2d 269, 271 [1st Dept 1998].) Defendants concede that an individual’s wealth may be relevant to a punitive damages award, as the marginal utility of money decreases as wealth increases and a wealthier defendant will feel less of a pinch from a given award than a poorer defendant. However, defendants argue that the same is not true for corporations. Defendants cite the case of Zazu Designs v L’Oreal, S.A. (979 F2d 499, 508 [7th Cir 1992]) to support this argument. In that case, the Court of Appeals for the Seventh Circuit opined that corporate wealth is not an appropriate consideration for punitive damages awards because corporate defendants differ from individuals in three important respects. First, they are abstractions and are owned and controlled by individual investors. While a corporation itself may have great wealth, it is the individual investors who will bear the brunt of a punitive damages award and they may not be of great wealth. (Id. at 508.) Secondly, a corporation’s net worth is a measure of its profits that have not been distributed to shareholders but instead have been reinvested in the corporation’s ventures and operations. Basing a corporation’s punitive damage award on its wealth will mean that corporations that have reinvested their profits will be more severely punished than corporations that distribute their profits. (Id.) Finally, in a products liability setting, larger corporations already have greater potential liability than smaller firms. Larger firms produce more of a given product than a smaller firm. Accordingly, when a large firm sells a defectively designed product, its potential liability for compensatory and punitive damages awards is already greater than that of a smaller firm. To increase an individual punitive damages award based upon the corporation’s wealth is unnecessary, as wealthy corporations will already be paying punitive damages awards in more cases than smaller corporations. (Id. at 508-509.) These arguments, however, were dicta, raised only after the court had determined that defendant was not liable for the underlying claim and that its conduct was not sufficient to support a punitive damages award.
*710 Moreover, these arguments do not support defendants’ contention that evidence of their financial condition must be excluded. Turning to the first argument, while a punitive damages award against a corporation will ultimately hurt the corporation’s shareholders, it should be noted that, in order for a punitive damages award to be rendered, the corporation must have acted in a malicious, wanton, or reckless, manner. Shareholders finance the corporation’s activities and may even profit from the wrongful conduct. Consequently, when entitlement to punitive damages has been established, shareholders cannot be considered innocent of the corporation’s malfeasance. Moreover, while some investors may only possess modest wealth, they are protected by limited liability laws and will only be liable to the extent of their investment in the corporation.
As to the second argument, it is indeed true that, in using a corporation’s net worth to determine punitive damages, the corporation that retains its profits may face greater liability than the corporation that distributes its profits. However, this argument supports the position that the latter corporations are under penalized, not that the former are over penalized. The best way to remedy this inconsistency is to err on the side of inclusion, not exclusion, of evidence relating to a corporation’s financial condition. The jury should consider not only the corporation’s net worth, but its net annual revenue, profits it may have derived from its tortious conduct, and any other relevant financial information.
Finally, simply because a firm is large and may have greater potential liability, it does not follow that it will actually pay more damages than a smaller firm. Thanks to economies of scale, a wealthier company can afford to engage in liability limiting activities that may be too expensive for smaller companies. For instance, a wealthier corporation can afford to lobby legislatures for liability limiting regulations, to undertake public relations campaigns to sway public opinion about its product, and even to engage in litigation tactics to deter future lawsuits. The Court of Appeals for the Seventh Circuit has opined that a wealthy defendant may fully litigate a claim against it, pressing every issue it can and exhausting all avenues of appeal, not because it hopes to be successful in that claim but because it hopes to deter future claims. (Mathias v Accor Economy Lodging, Inc., 347 F3d 672, 677 [7th Cir 2003].) A wealthy defendant who faces wide potential liability for a defective product could fully litigate the first cases brought against it, refusing to settle *711 even when its liability is clear, in order to establish a reputation as a “tough” defendant. Plaintiff attorneys, who often accept contingency fee agreements and advance their client’s litigation expenses out of their own pockets, would face greater costs and the inherent uncertainty of a jury’s verdict and would be less inclined to accept cases against that defendant. Defendant would face the same costs and risks, but if it had the resources to absorb those costs and risks, it would be rewarded with fewer lawsuits over time and a reduction in its overall liability. The problem with this strategy is that plaintiffs with otherwise valid claims could not afford the up-front cost of litigation, and would not be properly compensated for their injuries. In such a case, the court opined, punitive damages serve an important moderating function between a wealthy defendant and a plaintiff prosecuting his claim on speculation. The addition of the potential for a large punitive damages award may realign the risk-reward calculus resulting from the stratagem outlined above. Defendants who would otherwise be willing to litigate their cases to a jury verdict may not be able to tolerate the increased risk of a large punitive damage award. Plaintiffs, on the other hand, may be more inclined to take on such cases, knowing that they could potentially recover many times their actual damages. In such cases, evidence concerning a defendant’s wealth would be a critical factor in fixing a correct punitive damages award.
Since defendants did not show that evidence concerning their financial condition was not relevant, the court ruled that this portion of their motion was also without merit.
Defendants’ final argument for excluding evidence of their financial condition, that the probative value will be greatly outweighed by its prejudicial affect on the jury, was likewise found to be unconvincing. Defendants argued that any evidence of their financial condition would be, at best, minimally relevant to the question of punitive damages. They further argued that introduction of such evidence posed the very real risk that the jury would base its punitive damages award on certain prejudices the jurors may have had against large corporations and not on defendants’ conduct. As noted above, evidence of a defendant’s financial condition is highly relevant to the punitive damages award, not “minimally” so, as defendants characterized it. Moreover, two significant safeguards exist to protect defendants from any anticorporate prejudice on the part of the jury. First, before the trial began, the court ordered that it be trifurcated. In the first phase of the trial, the jury determined *712 that defendants were liable to plaintiffs for compensatory damages. In the second phase, the jury determined whether defendants were liable for punitive damages. After it determined that defendant Phillip Morris USA, Inc. must pay a punitive damages award, a third phase of the trial was held to determine the amount of that award. The court did not permit introduction of any evidence of any - of defendants’ financial condition until this third phase. Therefore, the jury made its determination to award punitive damages based upon defendants’ conduct. The risk that the jury would have chosen to punish defendants on the sole basis of their wealth was slight, as the jury had heard no evidence concerning defendants’ wealth at that point. In determining the amount of the punitive damages award, the jury could have considered defendants’ wealth as a factor, but, as noted above, this was a relevant and material consideration for such an award. By that phase of the trial, its prejudicial effect did not outweigh its probative value.
As a second safeguard, the court can review a punitive damages award to determine whether it comports with the Due Process Clause of the US Constitution. Under this power, the court may set aside a punitive damage award that has no relation to the nature of a defendant’s behavior, or is out of proportion with a plaintiff’s actual or potential injury. Thus, if the jury decided that it would set the punitive damages award based solely upon defendants’ wealth, disregarding completely the nature of conduct, or plaintiffs’ actual or potential injury, their award would likely run afoul of the Due Process Clause and the trial court would set it aside.
In light of the fact that evidence of a defendant’s wealth was relevant to the determination of a punitive damages award, and that safeguards existed that minimized any prejudice the jury may have had against large, wealthy corporations, the court found this argument to be without merit. Accordingly, the portion of defendants’ motion that seeks to exclude all evidence of their financial condition from the punitive damages phase of the trial was denied.
Defendants made an alternative application for an order restraining plaintiffs’ counsel from arguing that the award should be enhanced on the basis of defendants’ wealth, and a cautionary instruction to the jury concerning the consideration of wealth as a factor in the punitive damages award. Defendants proposed that the following instruction be given to the jury:
“You may not impose on Defendants a larger *713 punishment than you otherwise would think appropriate simply because they may be large corporations with substantial net worth, income, profits or revenues. You may not increase the award above the amount that is otherwise justified under the Instructions I have given you, simply because you believe that the defendants have substantial assets and could afford to pay more.”
As noted above, a defendant’s wealth is a relevant and material consideration in fixing a punitive damages award, and indeed a punitive damages award may be enhanced or reduced based upon a defendant’s financial condition. The above instructions, and the proposed limitation on plaintiffs’ counsel, would have confused the jury and obscured the importance of defendants’ wealth in their deliberations. Accordingly, the court did not issue either the order or the instruction.
At the commencement of the third phase of the trial, defendant Philip Morris USA, Inc. moved to limit the introduction of financial evidence to the financial condition of defendant within the State of New York. The court denied this motion and ruled that the appropriate consideration was the net worth of defendant. In New York, the relevant financial information on the question of the amount of a punitive damage award is defendant’s net worth. (Rupert, 48 AD2d at 272.) There is no rule that would limit the jury’s consideration to wealth held in state. While the Supreme Court in State Farm held that out-of-state conduct that has no nexus to the harm suffered is inadmissible on the question of entitlement to punitive damages (State Farm, 538 US at 421-422), it did not prohibit consideration of a defendant’s out-of-state wealth in fixing the amount of a punitive damages award. Indeed, there was no risk that the jury would have chosen to award punitive damages based upon defendant Philip Morris USA, Inc.’s out-of-state wealth, because that evidence would not have been before the jury when it determined that defendant was liable for punitive damages. The jury would not hear evidence concerning wealth until the third phase of the trial, when the jury was to determine the amount of punitive damages to be awarded.

. In the instant case, it is interesting to note that even though defendants argued that consideration must be given to all of the factors set forth in Voss and Denny, neither party offered to present any evidence bearing upon the seventh risk/utility factor.

. In October of 2004 (four years after the FDA case was decided), 7 USC §§ 1311 through 1316 were repealed. Nevertheless, at the time the motions in limine were decided, both parties addressed their submissions and arguments to the statute as it then existed. Since the repeal of the statute will not alter the outcome herein, in the interest of fairness to the parties, this decision will discuss only those arguments made at the time of the motions in limine.

. Corrigan is readily distinguishable from Cleghorn, Roginsky, Camillo, and Orange & Rockland Util. In none of those cases was it demonstrated that defendant corporations, through one of their directors or senior officers, directed or authorized the tortious conduct. Their liability arose through respondeat superior. In Corrigan, it was the corporation, and not merely one of its employees, that had published the novel, and thus the corporation was directly responsible for the damages that arose. Moreover, the knowledge necessary to establish punitive damages against defendant was the knowledge of a senior corporate officer, not merely of an employee. Accordingly, there was no risk in Corrigan that the corporate defendant would be punished for the conduct for which it had no direct culpability.